Edward CHAPMAN, Plaintiff-Appellant,

v.

B.C. ZIEGLER and Company,
Defendant-Respondent.

Court of Appeals

No. 2013AP282. Submitted on briefs September 3, 2013.
—Decided September 17, 2013.

2013 WI App 127

(Also reported in 839 N.W.2d 425.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *James P. Ginzkey*, Bloomington, IL and *James B. Duquette* of *Seymour, Kremer, Koch, Lochowicz & Duquette LLP*, Elkhorn.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Judith A. Williams-Killackey* and *Jonathan W. Hackbarth* of *Quarles & Brady LLP*, Milwaukee.

Before Curley, P.J., Fine and Kessler, JJ.

¶ 1. FINE, J. Edward Chapman appeals the order dismissing on summary judgment his breach-of-contract complaint against B.C. Ziegler and Company. His complaint sought "earned incentive compensation" that he claims he "earned in 2008" when he was a

Ziegler employee. He also appeals the order denying his motion for summary judgment and his motion to amend his complaint. We affirm.

## I.

¶ 2. A court must grant summary judgment to a party if "there is no genuine issue as to any material fact" and that party "is entitled to a judgment as a matter of law." Wis. Stat. Rule 802.08(2). We review *de novo* a circuit court's ruling on summary judgment, and apply the same legal principles. *See Enea v. Linn*, 2002 WI App 185, ¶ 11, 256 Wis. 2d 714, 720, 650 N.W.2d 315, 318. Summary-judgment analysis is a two-step process. *See Ibid.* The first step focuses on the complaint's claim—to see whether it asserts "a proper claim for relief" and whether the answer disputes the facts that purport to underlie that claim. *Ibid.* If the pleadings join issue on a proper claim for relief, the second step is whether there are any genuine issues of disputed facts that are material to the complaint's claim. *Ibid.* Thus, a party is entitled to summary judgment if the undisputed facts require it, even though the parties may dispute some facts in the case that have no bearing on the proper summary-judgment analysis. *See City of Milwaukee v. Burnette*, 2001 WI App 258, ¶ 8, 248 Wis. 2d 820, 834, 637 N.W.2d 447, 454 ("[A]lthough the trial court may have relied on some of the evidentiary matters presented to it by the City that are disputed by [an] affidavit, we decide this appeal only on the evidentiary record that is not disputed[.]"). Finally, we search the Record to see if the evidentiary material that the parties set out in support or in opposition to summary judgment supports reasonable inferences that require the grant or denial of summary

judgment, giving every reasonable inference to the party opposing summary judgment. *See Lecus v. American Mutual Insurance Co. of Boston*, 81 Wis. 2d 183, 189190, 260 N.W.2d 241, 244 (1977).

This case turns on the parties contract, and we also review *de novo* a circuit courts contract interpretation, including whether the contract is ambiguous. *See Borchardt v. Wilk*, 156 Wis. 2d 420, 427, 456 N.W.2d 653, 656 (Ct. App. 1990). Summary judgment is not appropriate when the issue turns on the terms of an ambiguous contract *and* the contracting parties' intent is both: (1) not clear, and (2) disputed. *BV/B1, LLC v. InvestorsBank*, 2010 WI App 152, ¶ 19, 330 Wis. 2d 462, 472, 792 N.W.2d 622, 628. "A contract is ambiguous when its terms are *reasonably* susceptible to more than one interpretation." *Ibid.* (emphasis added). Stated another way, "[a] contract is ambiguous '. . . (w)hen the language of a contract, *considered as a whole, is reasonably or fairly susceptible* to different constructions[.]' " *Luterbach v. Mochon, Schutte, Hackworthy, Juerisson, Inc.*, 84 Wis. 2d 1, 5, 267 N.W.2d 13, 14 (1978) (ellipses and parenthetical in original, quoted source; emphasis added). Thus, we analyze contract clauses in context, as they are reasonably understood, even if that is contrary to the parties' professed subjective intent. *See Solowicz v. Forward Geneva National, LLC*, 2010 WI 20, ¶ 36, 323 Wis. 2d 556, 582, 780 N.W.2d 111, 124 ("Language 'is ambiguous if it is susceptible to more than one reasonable interpretation.' However, if the intent of the contract can be certainly ascertained from the document itself, it will be enforced. 'By intent we do not mean the subjective intent of the drafter, but the scope and purpose of the [document] as manifest by the language used.' ") (quoted sources and internal citations omitted; brackets in original). Finally and critically, we

127

must interpret contracts to avoid absurd results. *See Star Direct, Inc. v. Dal Pra*, 2009 WI 76, ¶ 62, 319 Wis. 2d 274, 304, 767 N.W.2d 898, 913.

¶ 3. We now turn to the documents and the parties' contentions.

## II.

¶ 4. As we have seen, the first step in summary-judgment analysis is whether the complaint sets out a legally cognizable claim. Chapman's complaint asserted a breach-of contract claim, and alleged that in January of 2008, he accepted Ziegler's December 27, 2007, offer of employment. The offer recited that Chapman would work for Ziegler "as Managing Director / Head of Renewable Energy" with a "tentative[]" start date of "Monday, February 4, 2008." Neither party disputes that Chapman began working for Ziegler on that day. Chapman's complaint contends that Ziegler breached that contract by not paying him "earned incentive compensation" for 2008.

¶ 5. According to Chapman's complaint, he "spent his career and developed a specialty in structuring financing for the energy industry[,]" and, specifically, had a "20–year client, Environmental Power Corporation[.]" Further, the complaint says that in 2006 he "recommended [to Environmental Power Corporation] that Ziegler be retained as the investment banker for a bond offering for" Environmental Power Corporation, and that the "$60 million bond offering was successfully completed" in November of 2006. Chapman's complaint does not seek compensation from Ziegler for this match-making.

¶ 6. This case turns on the terms of the December 27, 2007, letter offering Chapman his Ziegler job. The

letter was signed by Donald A. Carlson, Jr., whom the letter describes as "Vice Chairman and Senior Managing Director." The letter sets out Chapman's duties with Ziegler if he accepted the offer:

> As you know, you will be reporting directly to me as we start up this new line of business. We've already discussed the primary responsibilities of this position; I thought it might be helpful to "recap" our discussion as a part of this offer:
>
> - Maintaining client relationships during deal execution, initiating new client relationships and expanding the business franchise within the renewable energy sector
>
> - Advising on capital raising solutions for clients
>
> - Originating, structuring, and/or executing transactions
>
> - Preparing presentations to senior level executives and board members
>
> - Managing, training, and mentoring team members
>
> We pride ourselves in our associates' ability to adapt to our fast-changing environment and to "think outside the box", so please keep in mind that the bullets noted above are simply an overview.

Chapman does not dispute that, as Carlson testified at his deposition, Chapman "did not have any other bankers reporting to him."

¶ 7. The crux of the summary-judgment dispute is the December 27, 2007, letter's description of what it termed "Your Compensation." (Bolding omitted.) This part of the letter has two parts: Chapman's "Base Draw" and his "Incentive Compensation." (Underlining omitted.) We quote these provisions, as material:

129

*Base Draw*

An annual base draw of $175,000 will be paid to you on a semi-monthly basis (the 15th and the last business day of the month).

*Incentive Compensation*

You *will* be eligible to earn incentive compensation based on 1) the renewable energy practice's revenue, 2) overall financial success of capital markets and 3) overall financial success of the firm. Please review the following structure and example:

- Revenues less direct expenses times a performance adjusted percentage (approximately 30–35%)

- The banker's base draw is netted from this amount

- The remainder equals incentive compensation

| | |
|---|---|
| Revenues less direct expenses | $ 1,000,000 |
| Performance percentage | 30% |
| Gross Compensation | $ 300,000 |
| Less Base Draw | $ 175,000 |
| Incentive Compensation | $ 125,000 |

A couple of notes to keep in mind:

- Our incentive compensation is paid in February following the performance year.

- Your performance will be reviewed at least annually, generally at year-end.

¶ 8. Chapman's complaint alleged: "Primarily through [Chapman]'s efforts, in 2008 Ziegler's renewable energy department completed three financings from which Ziegler's revenues less direct expenses totaled $1,366,000[,]" and that two of those financings

were with Environmental Power Corporation. The complaint claimed that Chapman's "earned incentive compensation on that $1,366,000 ranged from $189,800 at 30% to $258,100 at 35%." The complaint claimed damages within that range.[1] As material to this appeal, Ziegler's answer admitted that "in 2008 Ziegler's renewable energy department completed three financings from which Ziegler's revenues less direct expenses totaled $1,366,000" but denied that "these occurred primarily through [Chapman]'s efforts."

¶ 9. The summary-judgment Record reveals that the three financings were deals for: (1) Environmental Power Corporation in connection with California; (2) Environmental Power Corporation in connection with Nebraska; and (3) Homeland Renewable Energy. Chapman does not dispute this. Carlson's affidavit

---

[1] Chapman sought to amend his complaint to modify the calculations:

[Chapman]'s performance percentage for 2008 was set at 30%; [Chapman]'s 2008 base draw was $169,055 and [Chapman] received a 2008 bonus of $42,245; pursuant to his written contract attached hereto as Exhibit A [Chapman] is due $198,500 computed as follows:

| | |
|---|---|
| 2008 Revenues less direct expenses | $1,366,000 |
| 2008 performance percentage | x 30% |
| Gross Compensation | = 409,800 |
| Less base draw/bonus | - 211,300 |
| Unpaid Incentive compensation | $ 198,500 |

The proposed amended complaint sought this latter amount as damages. The circuit court denied as moot Chapman's motion to amend. Carlson's affidavit averred that Ziegler gave Chapman the $42,245 for 2008 "in order to incentivize him to continue working with Ziegler on building the renewable energy practice" even though, according to Carlson, Chapman "was not entitled to any incentive compensation for 2008 based on the terms of the Offer Letter" of December 27, 2007.

avers that the "total revenue, less direct expenses, generated from" the latter "two deals was $359,000." Chapman does not dispute this either. He also does not dispute the averment in Carlson's affidavit that if Ziegler applied "the approximate incentive compensation range of 30–35% in 2008" and also credited Chapman with the "entire revenue" Ziegler received for those latter two deals (Environmental Power Corporation Nebraska, and Homeland Renewable Energy), "the $359,000 in revenue, less direct expenses, from those two deals was still insufficient to cover [Chapman's] $175,000 draw" for 2008. Rather, Chapman focuses on the Environmental Power Corporation California deal, noting that because that deal was "completed" (as Ziegler's answer to his complaint acknowledges) in 2008, he was entitled to have his "earned incentive compensation" (as phrased by his complaint) also computed on the million dollars Ziegler received in 2008, for the Environmental Power Corporation California deal. He does not dispute with evidentiary summary-judgment material in the Record, though, the history of the Environmental Power Corporation California deal that Carlson sets out in his affidavit, which avers:

- In 2006, Ziegler successfully completed a deal for Environmental Power Corporation in Texas that Carlson "was credited for originating and structuring."

- "After the completion of the [Environmental Power Corporation] Texas deal, I [Carlson] continued to work with [Environmental Power Corporation] to finance the California deal, which also involved selling bonds. This deal was essentially the same structure I [Carlson] designed for the prior [Environmental Power Corporation] Texas deal. The [Environmental Power Corporation] California deal was

originated in 2005 and processed and structured
from 2006 to 2008, and Ziegler did not receive the
revenue from this deal until 2008."

• The "revenue" from Environmental Power Corpora-
tion California deal, "less direct expenses, totaled a
little over a million dollars."

Indeed, in an email to Carlson dated May 18, 2009,
Chapman acknowledged Carlson's "lead role" in the
Environmental Power Corporation California deal, but
noted that he was "especially surprised" that the Envi-
ronmental Power Corporation California revenue was
not included in the "bonus pool" from which he indi-
cated he should be able to draw: "When it [Environ-
mental Power Corporation] was a 20 year client of mine
I brought to Ziegler, accessing a tax-exempt energy
bond market I started, this is honestly not something
that would have occurred to me. None of this should
diminish even slightly the lead role you played in
getting the deal completed." As we have seen, however,
Chapman does not dispute that he put Environmental
Power Corporation and Ziegler together before Ziegler
hired Chapman, and that Carlson had the "lead role" in
structuring the Environmental Power Corporation
California deal that was completed in 2008.

██

¶ 10. Chapman has not presented any summary-
judgment evidence that the Environmental Power Cor-
poration California deal was put together or even
completed "[p]rimarily through [his] efforts" as alleged
in his complaint and in his proposed amended com-
plaint. Rather, he argues that, contrary to the circuit
court's conclusion, he was entitled to have what his
complaint calls his "earned incentive compensation"
under the contract (as set out in the December 27, 2007,

133

letter) based on *all* the revenue brought in by the energy group, *irrespective* of whether he was a procuring cause. In our view, the face of the December 27, 2007, letter defeats this unreasonable contention.[2]

¶ 11. First, as we have seen, we must interpret contracts to avoid unreasonable and absurd results. This is also true of contracts that may appear to be "ambiguous," as the circuit court determined this contract was, because ambiguity must be evaluated in the contract's context: "When interpreting an ambiguous contract provision, we must reject a construction that renders an unfair or unreasonable result. Likewise, we

---

[2] Chapman asserts that the circuit court ignored some of his summary-judgment submissions because they were not formally labeled as being in response to Ziegler's motion for summary judgment. Our reading of the Record does not fully support this contention. Nevertheless, our review here is *de novo* and we have considered all the summary-judgment material submitted by both parties. Further, although we agree with Chapman that if this case turned on whether: (1) Carlson told Chapman during their employment negotiations that Chapman's "incentive compensation" would be based "on the revenues that [Chapman] brought in and generated for the group[,]" as Carlson testified at his deposition, and that Carlson told Chapman "that he would be eligible for incentive compensation based on his personal production[,]" as Carson averred in his affidavit, or (2) the averment in Chapman's affidavit that he understood that he would get "incentive compensation based on the renewable energy practice's revenue[,]" and his deposition testimony that his "understanding is that basically I got credit for all of the revenues at some percentage," there would have to be a trial to resolve the conflict. We decide this appeal on the contract as it reads, however, not on what the parties say it provides; their dispute is not material to our summary-judgment analysis. *See City of Milwaukee v. Burnette*, 2001 WI App 258, ¶ 8, 248 Wis. 2d 820, 834, 637 N.W.2d 447, 454 (we ignore disputes irrelevant to the issue to be decided on summary judgment).

should adopt a construction that will render the contract a rational business instrument so far as reasonably practicable." *Gottsacker v. Monnier*, 2005 WI 69, ¶ 24, 281 Wis. 2d 361, 375, 697 N.W.2d 436, 442 (citations omitted). To say that the contract here obligated Ziegler to pay a person an "incentive compensation" that was "earned" even though that person *did nothing* to earn that "incentive compensation" is absurd and unreasonable, and is belied by the letter's language. Yet, that is Chapman's contention because he abandoned any effort to raise a genuine issue of fact that completion of the Environmental Power Corporation California deal during 2008 was, as his complaint alleged, "[p]rimarily through [his] efforts" as a Ziegler employee.[3]

¶ 12. Second, the contract fairly read supports the circuit court's conclusion that Chapman had to show a responsibility for the revenues for which his complaint sought an "earned incentive compensation" payment. We reprint the pertinent provisions here as an aid:

*Incentive Compensation*

You will be *eligible* to *earn incentive compensation* based on 1) the renewable energy practice's revenue, 2) overall financial success of capital markets and 3) overall financial success of the firm. Please review the following structure and example:

---

[3] The parties do not argue and we do not decide whether Chapman's failure to submit evidentiary summary-judgment support for this allegation in his complaint cuts off his breach-of-contract claim under the two-step summary-judgment analysis. *See Transportation Insurance Co., Inc. v. Hunzinger Construction. Co.*, 179 Wis. 2d 281, 292, 507 N.W.2d 136, 140 (Ct. App. 1993) ("[P]arty asserting a claim on which it bears the burden of proof at trial" has the summary-judgment burden " 'to make a showing sufficient to establish the existence of an element essential to that party's case.' ") (adopting and quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

- *Revenues* less direct expenses times a *performance adjusted percentage* (approximately 30–35%)

- The banker's base draw is netted from this amount

- The remainder equals incentive compensation

| | |
|---|---|
| Revenues less direct expenses | $1,000,000 |
| Performance percentage | 30% |
| Gross Compensation | $ 300,000 |
| Less Base Draw | $ 175,000 |
| Incentive Compensation | $ 125,000 |

A couple of notes to keep in mind:

- Our incentive compensation is paid in February following the performance year.

- Your *performance will be reviewed* at least annually, generally at year-end.

(Emphasis added.) This is what we have:

- As the circuit court recognized, "incentive" spurs something desired by the party offering the "incentive." Thus Google's "define" engine defines "incentive" as "a thing that motivates or encourages one to do something."[4] Chapman's position that under the contract he would be entitled to "earned incentive compensation" even if he had done nothing as a Ziegler employee to earn it is unreasonable.

- The contract notes that Chapman would be *"eligible* to earn incentive compensation," and that such incentive compensation will be "based on" the unit's, the firm's, and the economy's financial conditions. (Emphasis added.) Use of the word "eligible" supports the view that "earned incentive compensation"

---

[4] https://www.google.com/search?q=define+incentive&ie=UTF-8&oe=UTF-8&hl (last visited Sept. 6, 2013).

is not guaranteed, but, rather, depends not only on that the incentive compensation be "earned" but also that there be a pool of funds from which "earned incentive compensation" could be drawn—that is, the employee might have produced exemplary results but if the firm's business was going under either because of sluggish "capital markets" or other circumstances, the "based on" language recognizes that the "incentive compensation" could not be irretrievably guaranteed upfront because there might not be a pool of funds from which to make payment.

• The letter recognizes that there is a "performance" requirement to the "percentage" of the "earned incentive compensation." Thus the letter says that Chapman's "performance will be reviewed at least annually." This supports the common sense and reasonable view adopted by the circuit court that "performance" was a significant component of the entitlement to "be eligible to earn incentive compensation" under the Ziegler/Chapman contract.

¶ 13. As we have seen, Chapman has not only retreated from his complaint's assertion that he was "primarily" responsible for all the net 2008 revenues of $1,366,000, but also, he has not disputed by any summary-judgment evidence anywhere in the Record, Carlson's averments that the Environmental Power Corporation California deal (accounting for about one million of the 2008 revenues) was essentially a done deal before Chapman joined Ziegler. Accordingly, we affirm the circuit court's grant of summary judgment to Ziegler, its denial of Chapman's motion for summary judgment, and its denial as moot Chapman's motion to amend his complaint.

*By the Court.*—Order affirmed.