COURT OF APPEALS
DECISION
DATED AND FILED

September 29, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP591**

Cir. Ct. No. **2016CV397**

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT III**

DAKOTA INTERTEK CORP.,

PLAINTIFF-APPELLANT,

V.

CITY OF WAUSAU,

DEFENDANT-RESPONDENT.

APPEAL from a judgment of the circuit court for Marathon County: JILL N. FALSTAD, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Seidl, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Dakota Intertek Corp. appeals a judgment dismissing its breach of contract claim against the City of Wausau. Dakota, which

had been awarded a service contract from the City, settled an outstanding invoice from a supplier by virtue of a mutual release that specifically included Dakota's claim against the City. Nonetheless, Dakota argues that its claim against the City—or at least certain damages theories—survived the execution of the release. Dakota also argues the circuit court erroneously awarded the City attorney fees as a sanction for Dakota's conduct in continuing to pursue a frivolous claim.

¶2 We reject Dakota's arguments. The City was an express third-party beneficiary to the release agreement between Dakota and its supplier. Moreover, the release included the breach of contract claim and all associated damages theories advanced by Dakota in this lawsuit. Finally, Dakota offers no independent basis for challenging the circuit court's sanctions award, and we perceive no basis to reverse that award. Accordingly, we affirm.

## BACKGROUND

¶3 In August 2014, Dakota entered into a contract with the City relating to a riverfront redevelopment project. A geotechnical study revealed ground contamination on the project site that required remediation. Following a bid process, the City awarded the remediation contract to Dakota. The work bid by Dakota involved it chemically treating the contaminated soil before removing it for disposal. The City gave Dakota a list of four approved chemical suppliers, one of which was Regenesis Bioremediation Products, Inc.

¶4 After being awarded the contract, Dakota immediately began negotiating with Regenesis in an attempt to secure a favorable price for the purchase of the chemicals. On September 8, 2014, Dakota placed an order for

approximately half of the chemicals it anticipated needing for the project.[1] Dakota consulted neither the City nor its general contractor on the project, Stantec, prior to making the purchase, although it is undisputed Dakota was not prohibited from making advance purchases.

¶5 The purchase occurred prior to the City issuing a limited notice to proceed, which happened on September 11, 2014. Stantec, Dakota, and the Wisconsin Department of Natural Resources (DNR) had, by that point, been in discussions about the efficacy of the chemical formula Regenesis had proposed during the bidding process. According to Paul Herbert, a Dakota vice president, the DNR was concerned that the formula "would not bring the contaminant levels down low enough, and that a test pit or a test area would need … to be done to test the theory." Accordingly, the limited notice to proceed authorized Dakota to begin "mobilization, erosion control measures, asphalt removal and concrete removal." The notice further stated that the soil remediation and capping components of the project would require City approval, which would be given "when Stantec and [the DNR] have given the City approval to move forward."

¶6 Following pilot testing, Stantec determined that a greater amount of chemicals than initially thought would be required to effectively treat the soil. As a result, Stantec and the DNR did not believe the project should move forward with the chemical remediation, and Stantec began exploring other options, including landfilling the contaminated soil. On November 19, 2014, Dakota

---

[1] The chemicals were delivered to the remediation site on September 22, 2014. Dakota placed a single order in the designated quantity to save on transportation costs.

provided Stantec with a "Request for Information" form RFI 0014 outlining the cost of the landfilling plan. The landfill option was subsequently approved.

¶7 The matter of Dakota's chemical purchase from Regenesis, however, remained unresolved. The purchase contract between Dakota and Regenesis required payment for the chemicals within thirty days of delivery. The contract stated Dakota was allowed to return the chemicals within ninety days of delivery, subject to freight charges and a fifteen percent restocking fee. Regenesis notified Dakota that, pursuant to these terms, Dakota could return the chemicals to Regenesis at Dakota's expense at any time before December 21, 2014, accompanied by the payment of a restocking fee of approximately $6,800.

¶8 By December 21, 2014, Dakota had neither paid for nor returned the chemicals to Regenesis. Around the same time as Dakota provided Stantec with the RFI 0014 form, it began negotiating with Regenesis regarding a potential extension of the return window for the chemicals. Regenesis agreed to extend the payment term to March 31, 2015, but it refused to alter the ninety-day return window.[2] Dakota elected not to return the chemicals within the return window based on its beliefs that the landfilling option "didn't seem feasible based on costs at the time" and that the chemicals would ultimately be used for the project.[3]

¶9 As of February 19, 2015, Regenesis still had not been paid for the chemicals, and it sent a "Notice of Nonpayment" to the City, Stantec, and Dakota,

---

[2] Indeed, the agreement to extend the payment term required Dakota to waive the right to return the chemicals after December 21, 2014.

[3] Herbert testified that he mistakenly believed the extension of time for payment also applied to the return window, but he also testified that this mistaken belief was not the reason for Dakota retaining possession of the chemicals.

threatening a lien on the City's property or project funds if the invoice remained outstanding. In late March, Herbert e-mailed Stantec to confirm that the chemicals would not be used on the project, which Stantec confirmed. Dakota then unsuccessfully attempted to negotiate a return of the chemicals with Regenesis, but before Regenesis would consider the request, it demanded payment from Dakota for supplies it had provided on other projects involving Dakota.

¶10 In June 2015, Dakota requested that the City pay for the chemicals in full. The City's Board of Public Works unanimously denied the request. Dakota submitted a notice of claim with the City in the amount of $139,000, an amount representing the cost of the chemicals as well as lost profits due to the City's alleged "descoping" of the remediation project. The City denied the claim.

¶11 Meanwhile, Dakota and Regenesis continued to negotiate the payment for the chemicals. On October 29, 2015, Dakota and Regenesis entered into a settlement agreement entitled "Mutual Release of Regenesis and Dakota Intertek Corp. for All Legal and Contractual Issues." Dakota agreed to pay Regenesis $30,000, and both parties agreed to release all claims against one another relating to the City project. Importantly, the release stated the parties were also releasing all claims against the City.

¶12 When Dakota filed suit against the City in May 2016 for breach of contract, the City responded with a motion for summary judgment. The City, noting that it had been specifically included in the release between Dakota and Regenesis, asserted that it was a third-party beneficiary of that agreement, and it sought to enforce the release against Dakota. The City also sent Dakota a "safe

harbor" notice under WIS. STAT. § 802.05(3) (2017-18),[4] notifying Dakota that its lawsuit against the City had no merit because of the release and that the City would seek sanctions if the complaint was not withdrawn.

¶13    Dakota responded by filing a motion for sanctions against the City, alleging the City's motion for summary judgment was frivolous because there was no merit under Wisconsin law to any argument that the City was a third-party beneficiary of the release.   Additionally, Dakota submitted some evidentiary materials, including an affidavit by Dakota chief executive officer Wenbin Yuan acknowledging that he had signed the release on Dakota's behalf but had failed to notice that the City had been included in the agreement.  Neither Dakota nor the City withdrew any filings, and the circuit court set a briefing schedule on the City's summary judgment motion.

¶14    On May 8, 2018, the circuit court entered a written decision on the City's summary judgment motion and Dakota's motion for sanctions.  As to Dakota's motion for sanctions, the court admonished Dakota that its motion was "itself bordering on frivolousness" given that the release specifically included the City.  The court concluded that language in the release must be given effect regardless of Dakota's assertion that the City's potential liability was not the subject of negotiations with Regenesis.  The court also rejected Dakota's argument that the release, by its plain terms, only applied to issues between Dakota and Regenesis.  The court determined, however, that the release encompassed only

---

[4] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

claims that had accrued as of October 29, 2015. Accordingly, the court dismissed those claims but held that Dakota could pursue any claims accruing thereafter.

¶15 The City then filed a supplemental motion for summary judgment, arguing that all of Dakota's alleged claims for damages had accrued prior to October 29, 2015. Specifically, the City asserted Dakota's damages arising from the chemical purchase had occurred prior to the release's execution, as had any damages for alleged "lost profits" because the scope of the contract had changed prior to that date. The City noted that Dakota had certified the project substantially complete in September 2015, and that final payment had been issued prior to October 29, 2015, minus a retainage that required additional documentation in order to become payable. Thus, the City took the position that the only potentially viable claim Dakota might have was for the retainage, but it argued no such claim existed because Dakota had never completed the paperwork or issued a final invoice seeking that sum. The City supported its motion with affidavits from two City employees, who collectively averred that Dakota had not submitted wage verification forms, final lien waivers, or an invoice required by the City's contract with Dakota to release the retainage.

¶16 In response, Dakota acknowledged that the project reached substantial completion prior to the execution of the release. It again argued, however, that its claim for lost profits should proceed because the City was not a third-party beneficiary of the release—i.e., the same argument that the circuit court had rejected in its May 8, 2018 decision. Additionally, Dakota argued its retainage claim survived, as it had provided all necessary documents under the contract with the City to release those funds. Dakota attached to an affidavit the payroll and wage documentation it stated it had submitted to the City on an unspecified date.

¶17     The City's reply brief accused Dakota of attempting to mislead the circuit court by implying that the necessary retainage documents had been previously provided to the City. The City noted that Dakota had not actually asserted that it previously provided the City with any of the documentation—and the City represented that, in fact, it had not been provided the relevant documentation prior to Dakota's court filing. The City noted that Herbert, during his June 2017 deposition, admitted Dakota had not submitted the final paperwork because they did not want to "aggravate a good client." Additionally, the City noted that the relevant documentation should have been provided in discovery if it existed, and that some of the wage verification paperwork was dated in 2018—well after Dakota had commenced its lawsuit. As a result, the City maintained that Dakota was pursuing a frivolous claim, and it sought attorney fees as a sanction.

¶18     After additional briefing on the sanctions issue (during which Dakota admitted that it had not provided the City with the necessary retainage documentation prior to filing its response brief), the circuit court concluded that Dakota had "offered essentially no dispute" to the City's assertion that any potential claim had accrued prior to the execution of the October 29, 2015 release. The court chastised Dakota for continuing to pursue its lost profits claim on the same basis the court had earlier rejected.[5] It also determined that, given Dakota's concession that it had not provided the final retainage documents prior to filing its response brief, the conclusion was "inescapable" that Dakota had been pursuing a retainage claim prior to that filing without a valid basis.

---

[5] The circuit court noted Dakota should either have explicitly stated it was attempting to preserve the argument for appeal or filed a motion for reconsideration.

¶19 In all, the circuit court concluded Dakota had no valid claims that survived the execution of the release between Dakota and Regenesis: "Any claim for lost profits would have accrued before that point, and any claim for retainage was premature." The court granted the City's supplemental summary judgment motion, and it further concluded that Dakota's lost profits and retainage claims lacked any basis in fact or law. Because Dakota had persisted in advancing those claims after the court's May 8, 2018 decision, the court awarded the City reasonable attorney fees and costs incurred after that date. Dakota now appeals.

## DISCUSSION

¶20 The issues Dakota presents in this appeal reduce down to one main issue: whether the circuit court properly granted the City's summary judgment motions. We review a grant of summary judgment de novo. *Chapman v. B.C. Ziegler & Co.*, 2013 WI App 127, ¶2, 351 Wis. 2d 123, 839 N.W.2d 425. Summary judgment is appropriate if the record demonstrates that there is no genuine issue as to any material fact and the moving party is entitled to relief as a matter of law. WIS. STAT. § 802.08(2). Reviewing a grant of summary judgment involves following a well-established methodology under which we first examine the pleadings to determine whether a claim has been stated and, if so, we then analyze whether any factual issues exist. *Kieninger v. Crown Equip. Corp.*, 2019 WI 27, ¶11, 386 Wis. 2d 1, 924 N.W.2d 172.

¶21 First, and primarily, Dakota argues it was error for the circuit court to grant the City's summary judgment motions because the City was not a third-party beneficiary to the release between Dakota and Regenesis. A person claiming status as a third-party beneficiary to a contract must show that the contracting parties "entered into the agreement for the direct and primary benefit

9

of the third party, either specifically or as a member of a class intended to benefit from the contract." ***Sussex Tool & Supply, Inc. v. Mainline Sewer & Water, Inc.***, 231 Wis. 2d 404, 409, 605 N.W.2d 620 (Ct. App. 1999). An indirect benefit incidental to the primary contractual purpose is insufficient. ***Becker v. Crispell-Snyder, Inc.***, 2009 WI App 24, ¶11, 316 Wis. 2d 359, 763 N.W.2d 192.

¶22 Here, Dakota argues that neither it nor Regenesis intended for the City to benefit from the release. In so arguing, Dakota improperly focuses on extrinsic evidence of intent—for example, the parties' negotiations and Yuan's assertion that he was surprised to see the City was included in the release—without any regard to the language of the contract itself. A contract for the benefit of a third party is subject to the same rules governing the formation of all contracts. ***Schilling v. Employers Mut. Cas. Co.***, 212 Wis. 2d 878, 886-87, 569 N.W.2d 776 (Ct. App. 1997).

¶23 Those rules require that we treat the language the parties used as the expression of their intent. ***Town Bank v. City Real Estate Dev., LLC***, 2010 WI 134, ¶33, 330 Wis. 2d 340, 793 N.W.2d 476. "Stated another way, the best indication of the parties' intent is the language of the contract itself …." ***Id.*** Not surprisingly, then, "[a] party proves its third-party beneficiary status by pointing to specific language in the contract establishing intent." ***Becker***, 316 Wis. 2d 359, ¶11. The release in this case specifically identifies the City as an entity against which the parties were releasing all claims. As a result, the plain language of the agreement establishes the City's status as a third-party beneficiary.[6]

---

[6] Because the City was specifically named in the release, it is unnecessary to consider whether the City was a member of a class intended to benefit from the contract.

¶24 Dakota's arguments regarding what was discussed during negotiations with Regenesis, or whether the City was meant to be included in the release, are inapposite. These matters are extrinsic evidence of intent, which may not be considered when a contract is unambiguous. *See Town Bank*, 330 Wis. 2d 340, ¶33. Dakota does not point to any ambiguity, and, again, the release unambiguously establishes the City as a third-party beneficiary. If the City was included by mistake, as Dakota seems to suggest, it was incumbent upon Dakota to seek an amendment to the release or pursue a claim for reformation of the agreement—neither of which Dakota has done. *See Krenz v. Medical Protective Co. of Fort Wayne, Ind.*, 57 Wis. 2d 387, 391, 204 N.W.2d 663 (1973).

¶25 Oddly, Dakota relies on *Krenz* in support of its assertion that the City was not a third-party beneficiary to the release. In *Krenz*, a general release drafted as a result of settlement negotiations between an injured party and the alleged tortfeasor had the legal effect of including a cause of action for malpractice against the injured party's physician. *Id.* at 390. The parties to the release subsequently amended it to exclude the injured party's cause of action against the physician, and our supreme court held that "the parties to a release can agree to amend it to conform to their intention or more precisely in the context of this case to exclude an effect they did not intend." *Id.* at 391. In so holding, the court observed that the physician was not a third-party beneficiary and could not prohibit the parties from amending their agreement. *Id.* at 391-92.

¶26 The distinguishing features of *Krenz* are obvious. The City here was specifically named as a third-party beneficiary in the release; the release in *Krenz*

did not so identify the physician.[7]  Moreover, the City is not similarly positioned to the physician in *Krenz*.  The City is attempting to enforce an existing agreement, which no parties have attempted to alter.  Unlike the physician in *Krenz*, the City is not attempting to challenge the amendment or reformation of an agreement that previously protected it.  Consequently, our supreme court's observations about the equities of the situation vis-à-vis the physician in *Krenz* are not clearly applicable to this case.

¶27     Dakota next argues that the release "only applies to disputes or claims between Dakota and Regenesis" and that its damages claim against the City for lost revenue and profits falls outside the ambit of the agreement.  Relatedly, Dakota argues that it has a viable claim for the retainage withheld by the City.  The City, on the other hand, contends that the release language encompasses *all* of Dakota's damages claims against it—regardless of when they accrued.[8]  Accordingly, the City argues the circuit court erred in its May 8, 2018 decision by not dismissing the complaint entirely, although the City contends the error was immaterial because the court ultimately reached the correct conclusion.

¶28     To resolve the parties' disagreements in these respects, we turn to the language of the release.  In relevant part, the release provided as follows:

---

[7] Indeed, our supreme court noted the release was a general one and suggested it was mere inadvertence that caused the malpractice claim to be included in the release; the injured party's attorney "apparently did not know the legal effect of the release which he had his clients sign," and there was no reservation of rights with respect to the cause of action against the physician. *Krenz v. Medical Protective Co. of Fort Wayne, Ind.*, 57 Wis. 2d 387, 391, 393, 204 N.W.2d 663 (1973).

[8] The City also asserts that the circuit court's May 8, 2018 summary judgment decision improperly disposed of only a portion of Dakota's claim for breach of contract.  We need not address this issue, however, because we conclude that the City was otherwise entitled to summary judgment.

> WHEREAS the parties have agreed to amicably resolve, settle and compromise all matters as relates to an outstanding balance of $52761.92 for City of Wausau chemical mixing project with all of Dakota purchase orders regarding to the projects.
>
> NOW THEREFORE in consideration of the mutual covenants contained herein, and the sum of **$30000.00** to be paid by [Dakota] to [Regenesis] upon receipt of this mutual release signed by [Regenesis] … each party hereby remises, releases, acquits, satisfies, and forever discharges the other party (i.e., a mutual release) and its heirs, city of Wausau, personal representatives, successors, assigns, employees, agents, shareholders, members, interest holders in the companies, and attorneys of and from all actions, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, attorneys fees, expenses, contracts, controversies, agreements, promises, variances, damages, judgments, executions, claims and demands whatsoever, known or unknown, asserted or not, in law or in equity, which the releasing party ever had, now has, or may have, … for, upon or by reason of any matter, cause or thing whatsoever, from the beginning of the world to the date of this release for all issues between [Regenesis] and [Dakota].

¶29    We first address Dakota's assertion that the release applies only to "issues between [Regenesis] and [Dakota]." Dakota reads this language as a substantive limitation on the scope of the agreement, rather than as a restrictive clause generally describing the release. Dakota contends the only "issue" between Dakota and Regenesis was the payment for the chemicals. Consequently, Dakota argues its present breach of contract claim against the City could not have been included in the scope of the release, and any such release lacked consideration from the City.

¶30    We reject these arguments. The scope of the agreement is clearly broad and encompasses, insofar as the City is concerned, "all actions, suits, debts, dues, sums of money, … contracts, controversies, agreements, promises … damages, … claims and demands whatsoever, known or unknown, asserted or not,

13

… which [Dakota] ever had, now has, or may have, … for, upon or by reason of any matter, cause or thing whatsoever." Dakota's argument is incompatible with this language.[9] Moreover, the release refers to itself repeatedly as a "Mutual General Release," which (consistent with the substantive language used and the lack of an express reservation of rights) tends to connote a broad release of claims. *See Brown v. Hammermill Paper Co.*, 88 Wis. 2d 224, 235-36, 276 N.W.2d 709 (1979). Finally, grammatically, the fact that the phrase "for all issues between [Regenesis] and [Dakota]" is not offset with a comma supports the City's assertion that the phrase is a restrictive clause modifying "this release," as opposed to a substantive limitation on the agreement's earlier language.[10]

¶31     Additionally, we agree with the City that all claims Dakota had or might have had against the City at the time the release was executed were included within its scope. Again, the release applies to all claims "which the releasing party ever had, now has, or may have, … for, upon or by reason of any matters, cause or thing whatsoever, from the beginning of the world to the date of this release." The claims released include those "known or unknown, asserted or not, in law or equity."

---

[9] Courts must read releases in their entirety, not by isolating specific phrases stripped of context. *See Brown v. Hammermill Paper Co.*, 88 Wis. 2d 224, 234, 276 N.W.2d 709 (1979).

[10] As the City articulates, it is unclear that Dakota would prevail even if the language was interpreted as Dakota suggests. The "issues" between Dakota and Regenesis clearly involved the City, as Regenesis had threatened a lien on City property for the nonpayment and Dakota had repeatedly sought reimbursement for the chemical purchase from the City. Dakota does not respond to the City's assertion that, under state law, if the City was not included in the release, Regenesis could have made a side demand against the City for the remaining amount due on the chemical invoice, and the City could, in turn, have pursued Dakota for that amount. Unrefuted arguments are deemed conceded. *Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp.*, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979).

¶32 Dakota asserts its claims seeking lost profits and the retainage somehow fall outside the scope of this language. But Dakota mistakenly views these as independent claims, rather than different damages available arising from a single legal theory: breach of contract. Indeed, the only cause of action advanced in Dakota's complaint against the City was a breach of contract claim.

¶33 A cause of action for breach of contract accrues on the date of the breach. *Segall v. Hurwitz*, 114 Wis. 2d 471, 490, 339 N.W.2d 333 (Ct. App. 1983). While in some instances a "partial breach" might give rise to a new claim for each separate breach, "[i]f a single[,] total breach occurs, the right to bring an action accrues at that time." *Id.* at 491-92. Here, assuming that Dakota's breach of contract claim was meritorious, it undoubtedly accrued in March 2015, at the time of the City's alleged "descoping" of the contract to focus on landfilling rather than chemical remediation. As a result, Dakota's breach of contract claim—and all the attendant alleged damages, including payment for unused chemicals, lost profits, and the retainage on the modified contract—was included within the scope of the release.[11]

¶34 Viewing the damages elements as separate "claims" does not get Dakota any further. It is undisputed that the City's decision not to use the chemicals and its modification of the remediation method occurred prior to the execution of the release, so as to include in the release Dakota's claims regarding payment for the chemicals and lost profits. Additionally, the modified contract

---

[11] Dakota asserts the City forfeited this argument by not raising it in the circuit court. However, "[a] respondent may advance on appeal, and we may consider, any basis for sustaining the trial court's order or judgment." *Doe v. General Motors Acceptance Corp.*, 2001 WI App 199, ¶7, 247 Wis. 2d 564, 635 N.W.2d 7.

15

was certified as substantially complete in September 2015; certainly, Dakota was aware at least by that time that it had a potential claim for the retainage. Regardless of whether that claim had accrued at the time the October 2015 release was signed, it unambiguously falls within the broad scope of the release's language as a claim that Dakota "ever had, now has, or may have, … upon … any … thing whatsoever, from the beginning of the world."

¶35     Finally, there is no merit to Dakota's assertion that its claim against the City should proceed because there was no consideration offered by the City for the release.  The City, being a third-party beneficiary to the agreement, was not required to provide any consideration.  *See Meleski v. Schbohm LLC*, 2012 WI App 63, ¶6, 341 Wis. 2d 716, 817 N.W.2d 887 (citing *Severson v. Milwaukee Auto. Ins. Co.*, 265 Wis. 488, 494-95, 61 N.W.2d 872 (1953)).

¶36     Dakota also challenges the circuit court's decision to award attorney fees to the City as a sanction for Dakota's conduct in pursuing a claim with no legal or factual basis.  Dakota offers no independent analysis of the sanctions award, however; it merely argues that because its claims survived the execution of the release with Regenesis, it cannot be sanctioned.  We have rejected Dakota's arguments regarding the release, and Dakota offers no other basis for overturning the sanctions award.

¶37     In any event, we review a circuit court's decision to sanction a party under WIS. STAT. § 802.05 for an erroneous exercise of discretion.  *See Bettendorf v. Microsoft Corp.*, 2010 WI App 13, ¶15, 323 Wis. 2d 137, 779 N.W.2d 34 (2009).  It is undisputed that the City complied with the procedural "safe harbor" requirements under § 802.05(3).  The circuit court, having interpreted the release to only apply to claims that had "accrued" by October 29, 2015, concluded Dakota

16

had no factual or legal basis for pursuing a claim against the City after its initial summary judgment decision dated May 8, 2018.

¶38 Despite the circuit court's mistaken focus on the "accrual" of Dakota's claims, we perceive no error in its sanctions award. Again, in support of its lost profits damages theory, Dakota advanced only arguments that had already been rejected in the initial summary judgment decision. Moreover, it was generally undisputed that Dakota had not supplied the necessary documents to release the retainage, at least not until its response to the City's supplemental summary judgment motion. And even then, the City considered Dakota's documentation insufficient, as Dakota had failed to submit a final invoice or lien waivers. As such, the circuit court was correct that Dakota's retainage claim had not ripened, such that there was no basis for maintaining that claim in this lawsuit.

¶39 On appeal, Dakota contends that lien waivers were unnecessary. Dakota argues the final payment was contingent only upon the following items identified in section 3.07 of the "Execution Requirements" of the contract:

> A. Upon completion of the punch list items and as a condition of final payment, the CONTRACTOR shall prepare and submit to the Engineer for transmission to the OWNER, all exhibits required by the Project Manual including:
>
> 1. Work site shall be clean.
>
> 2. Punch list is completed.
>
> 3. Operation and maintenance manuals.
>
> 4. Affidavit of compliance with prevailing wage rate determination, State.
>
> 5. All weekly payroll reports, Federal.

Dakota argues it had complied with each of these requirements as of the date the circuit court ordered sanctions.

¶40    Dakota ignores that the contract explicitly incorporated a separate "General Conditions" document.    General condition number twenty-one, "PAYMENT OF CONTRACTOR," states that "[a]s a condition precedent to the payment of the … final estimate to the CONTRACTOR, the OWNER may require the CONTRACTOR to furnish proof that he has paid all wages and other current outstanding obligations incurred in connection with this work."    There is no indication that Dakota had complied with this requirement at the time of the court-ordered sanctions, so as to entitle Dakota to the retainage.    Accordingly, we perceive no basis to reverse the sanctions award.

    *By the Court.*—Judgment affirmed.

    This opinion will not be published.    *See* WIS. STAT. RULE 809.23(1)(b)5.