**2023 WI App 21**

# COURT OF APPEALS OF WISCONSIN
# PUBLISHED OPINION

Case No.:        2021AP1867

Complete Title of Case:

> **ALISON M. RYAN, AS TRUSTEE OF THE RYAN JOINT REVOCABLE
> TRUST AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF
> PATRICK T. RYAN,**
>
>     **PLAINTIFF-RESPONDENT,**
>
>       **V.**
>
> **ERIN T. RYAN,**
>
>     **DEFENDANT-THIRD-PARTY PLAINTIFF-APPELLANT.**

| | |
|---|---|
| Opinion Filed: | March 23, 2023 |
| Submitted on Briefs: | May 19, 2022 |

| | |
|---|---|
| JUDGES: | Blanchard, P.J., Graham, and Nashold, JJ. |
| Concurred: | |
| Dissented: | |

Appellant
ATTORNEYS:        On behalf of the defendant-third-party plaintiff-appellant, the cause
was submitted on the briefs of *Justin H. Lessner* and *Melissa K.
Warner* of *Axley Brynelson, LLP*.

Respondent
ATTORNEYS:        On behalf of the plaintiff-respondent, the cause was submitted on the
brief of *Ronald R. Ragatz* of *DeWitt LLP*.

COURT OF APPEALS
DECISION
DATED AND FILED

March 23, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1867**

STATE OF WISCONSIN

Cir. Ct. No. 2020CV1997

IN COURT OF APPEALS

---

ALISON M. RYAN, AS TRUSTEE OF
THE RYAN JOINT REVOCABLE TRUST
AND AS PERSONAL REPRESENTATIVE OF
THE ESTATE OF PATRICK T. RYAN,

    PLAINTIFF-RESPONDENT,

  V.

ERIN T. RYAN,

    DEFENDANT-THIRD-PARTY
    PLAINTIFF-APPELLANT.

---

APPEAL from an order of the circuit court for Dane County: FRANK D. REMINGTON, Judge. *Affirmed*.

Before Blanchard, P.J., Graham, and Nashold, JJ.

¶1 NASHOLD, J. Erin Ryan appeals a circuit court order granting summary judgment to Alison Ryan on Erin's counterclaim against Alison, and

dismissing Erin's counterclaim.[1] Erin's counterclaim alleges that Alison's former husband, Patrick Ryan, breached his obligation to maintain life insurance under a shareholder agreement when he committed suicide. We agree with the circuit court that "maintain" under the shareholder agreement means to own policies on the other shareholder's life and to pay the premiums due on those policies and that therefore Patrick's suicide did not constitute a breach of the agreement. Accordingly, we affirm.

## BACKGROUND

¶2      Erin and Patrick were brothers, and Alison is Patrick's widow. Erin and Patrick owned and operated an ambulance business together. They were equal co-owners of the companies that comprised the business, which included Ryan Bros. Ambulance, Inc., Ryan Bros. Fort Atkinson, LLC, and PEAT, LLC (collectively, the "Companies"). Erin and Patrick, along with the Companies, entered into an Amended and Restated Stock Purchase and Redemption Agreement and LLC Interest Purchase Agreement (the "Agreement"). The Agreement requires that, upon the death of one of the brothers, the surviving brother would be required to purchase the deceased brother's shares of the Companies at a price determined by the Agreement.

¶3      The Agreement contains a provision, Section 5.1, that requires Erin and Patrick to each own and pay premiums on at least $5 million of life insurance on the other's life to ensure that if one of the brothers died, the other would be able to purchase the deceased brother's shares in the Companies and continue the

---

[1] Alison is acting in her capacity as Trustee of the Ryan Joint Revocable Trust and as Personal Representative of The Estate of Patrick T. Ryan. Separately, because the three individuals discussed in this opinion share the same last name, we refer to them by their first names.

ownership and management of the Companies. Significant here, Section 5.1 states, "Such policies shall be maintained during the term of this Agreement."

¶4 Patrick and Erin each obtained $6 million in life insurance on the life of the other. Exhibit A to the Agreement provides the life insurance policies that Patrick and Erin each individually owned on the life of the other, including the policy pertinent here—a Prudential policy with a face value of $1 million ("Prudential Policy" or "the Policy"). The Prudential Policy was owned by Erin—who paid its premiums and was the beneficiary—and insured Patrick's life. The Prudential Policy contains a "Suicide Exclusion," providing that if the insured (here, Patrick) dies by suicide within two years from the issue date, the Policy "end[s] without any death benefit paid" and the premiums are returned.

¶5 Patrick died by suicide within two years of the issuance of the Prudential Policy. Following Patrick's death, three of the four life insurance policies on Patrick's life held by Erin paid out their full face values, for a total of $5 million. Prudential denied payment of the $1 million death benefit under the Policy's suicide exclusion. This meant that Erin did not receive the $1 million death benefit as the beneficiary on the Policy.

¶6 Alison filed suit against Erin, alleging breach of contract and unjust enrichment. Specifically, Alison alleged that Erin had received, or had access to, $5 million in life insurance proceeds but refused to purchase Patrick's interests in the Companies at the price and within the timeframe provided by the Agreement. Erin counterclaimed, alleging that Patrick breached Section 5.1 of the Agreement

because, by taking his own life within two years of the Policy's issuance, he failed to "maintain"[2] the Policy.

¶7 The parties entered into a stipulation that partially resolved the claims. Pursuant to the stipulation, the parties agreed to a total purchase price for the Companies of approximately $5 million. Alison transferred all of Patrick's shares and member interests in the Companies to Erin in exchange for approximately $4 million of the $5 million that three of Erin's four policies had paid out. The parties further agreed that the $4 million paid to Alison was $1 million less than the actual price for the shares and that the circuit court would decide whether the remaining $1 million would go to Alison, who sought the funds to complete Erin's purchase, or to Erin, who sought the funds under his counterclaim.

¶8 The parties filed cross-motions for summary judgment on Erin's counterclaim. The circuit court granted Alison's motion for summary judgment and denied Erin's motion. The court rejected Erin's argument that, by committing suicide, Patrick breached Section 5.1 of the Agreement by failing to "maintain" the Prudential Policy. The court determined that the word "maintain" is not ambiguous and, in the context of Section 5.1, means that each brother had an obligation to own life insurance policies for the other brother's life and to pay the premiums. Thus, the court concluded that Patrick did not have an obligation to maintain insurance on his own life, nor did he "have an obligation to modify his behavior based on Erin's ownership of an insurance policy on Patrick's life." As a result, the court

---

[2] As noted in the text above, Section 5.1 actually uses the phrase "[s]hall be maintained." For ease of reading, this opinion follows the lead of the circuit court and the parties and sometimes uses the word "maintain" rather than "maintained."

determined that Patrick did not breach the Agreement by committing suicide and that Alison is entitled to the remaining $1 million. Erin appeals.

## DISCUSSION

### I. Standard of Review.

¶9 We review a circuit court's ruling on summary judgment de novo. ***Chapman v. B.C. Ziegler & Co.***, 2013 WI App 127, ¶2, 351 Wis. 2d 123, 839 N.W.2d 425. Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. WIS. STAT. § 802.08(2) (2021-22).[3] Here, the parties agree that there are no facts in dispute on the decisive issue in this case; instead, each party claims that, under the language of Section 5.1 of the Agreement, the party is entitled to judgment as a matter of law. We agree with the parties' framing of the issue. Therefore, this case turns on the interpretation of a contract, which is a question of law. ***Star Direct, Inc. v. Dal Pra***, 2009 WI 76, ¶18, 319 Wis. 2d 274, 767 N.W.2d 898. We review questions of law de novo. ***Id.***

### II. The Circuit Court Properly Concluded that Patrick Did Not Breach the Agreement By Committing Suicide.

¶10 Erin argues that Patrick had an obligation under Section 5.1 of the Agreement to "maintain" the Prudential Policy on his own life that was taken out by Erin and that Patrick breached this obligation by committing suicide within two years of the Policy's issuance. Section 5.1 states, in pertinent part:

> 5.1 <u>Life Insurance</u>. Each Shareholder shall own and pay premiums on at least $5,000,000 of life insurance on the

---

[3] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

5

other Shareholder to fund the cross purchase obligation of the continuing Shareholder pursuant to this Agreement on the death of a Shareholder. A listing of the policies is attached hereto as Exhibit A. Such policies shall be maintained during the term of this Agreement.

¶11    As previously noted, Erin was the owner of the Prudential Policy and paid its premiums, and Patrick was the Policy's insured. For the reasons that follow, we agree with the circuit court that Patrick had no obligation to "maintain" insurance on his own life. Instead, Patrick was obligated to own and pay premiums for the insurance on Erin's life and Erin was obligated to own and pay premiums for the insurance on Patrick's life. As a result, we further conclude that Patrick had no obligation to "maintain" the Prudential Policy and did not breach the Agreement by committing suicide.

¶12    The core dispute centers on the meaning of the phrase, "Such Policies shall be maintained," as used in Section 5.1 of the Agreement. The circuit court concluded, and neither party disputes, that the term "maintained" is unambiguous. "[U]nambiguous contract language controls contract interpretation." *Kernz v. J.L. French Corp.*, 2003 WI App 140, ¶9, 266 Wis. 2d 124, 667 N.W.2d 751. "When the terms of a contract are clear and unambiguous, we construe the contract's language according to its literal meaning." *Ash Park, LLC v. Alexander & Bishop, Ltd.*, 2015 WI 65, ¶35, 363 Wis. 2d 699, 866 N.W.2d 679. Moreover, we "consider the language of the contract as a whole, and analyze contract clauses in context, as they are reasonably understood." *MS Real Est. Holdings, LLC v. Donald P. Fox Fam. Tr.*, 2014 WI App 84, ¶29, 356 Wis. 2d 307, 853 N.W.2d 627.

¶13    We conclude that, considered in context, the requirement that "[s]uch policies … be maintained" appearing in the third sentence of Section 5.1 refers to the policies mentioned in the two preceding sentences and to the obligations that

each shareholder has with respect to those policies as set forth in the first sentence. Stated differently, the first sentence describes what it means for "[s]uch policies" to be "maintained"—namely, that each shareholder must own and pay premiums for life insurance on the life of the other shareholder (in the required amount). As the circuit court explained:

> Turning to the context in which "maintain" is used, two particular sentences of provision 5.1 stand out: "Each Shareholder shall own and pay premiums on at least $5,000,000 of life insurance on the other Shareholder" and "Such policies shall be *maintained* during the term of this Agreement." The language is written to apply to both Erin's ownership and payment of premiums of life insurance policies on Patrick's life and Patrick's ownership and payment of premiums of life insurance policies on Erin's life. The sentence construction imposes a responsibility on each respective shareholder to own and make regular payments on the policies. It does not [otherwise] impose a responsibility on the insured to behave or act in a certain way.

(Citation omitted.) Thus, because the duty to "maintain" the policies refers solely to the policyholder's obligation to own policies on *the other brother* and to pay the respective premiums, Patrick had no duty under the Agreement with respect to the Prudential Policy. Instead, it was *Erin* who had the obligation to "maintain" in this manner the Prudential Policy on Patrick's life. Patrick had a separate obligation to "maintain" insurance policies on Erin's life. And because Patrick had no duty under the Agreement to "maintain" the Prudential Policy, he likewise had no obligation to refrain from committing suicide or from taking any other action with respect to that Policy. We therefore reject Erin's contention that "Patrick and Erin had joint obligations to maintain the Prudential Policy" on Patrick's life. The Agreement contains no "joint" obligation to maintain the Prudential Policy or any other policy; rather, the brothers' obligations were individual—to maintain their own respective policies on each other's lives.

7

¶14    Erin raises several arguments in support of his contention that Patrick's suicide constituted a failure to maintain the Prudential Policy. These arguments are unpersuasive. Erin argues that Patrick, as the insured, had "attendant responsibilities" to ensure that the Prudential Policy's death benefit would be paid. According to Erin, this responsibility includes the duty to refrain from committing suicide within two years of the Policy's issuance. Erin bases this argument on the premise that Patrick's death by suicide had the same effect as would a failure to pay the premiums on the Prudential Policy, namely, the policy proceeds would not be paid. While that may be true, such an effect does not allow this court to read a requirement into the plain language of Section 5.1 that does not exist. *See Ash Park*, 363 Wis. 2d 699, ¶35.

¶15    Erin also argues that Patrick was required "to take other steps to ensure the policy was effective," such as submitting health and family history and sitting for a medical examination as part of the application for the Prudential Policy. According to Erin, because Patrick had to take these additional actions so that Erin could obtain the Policy, Patrick's obligation under Section 5.1 of the Agreement "was not simply limited to paying premiums" on the Policy. However, the Agreement itself does not contain these obligations and we discern no reason to interpret "maintain" to mean that he had these obligations. In fact, given that the Prudential Policy had a "Contract Date" of May 18, 2018, and the Agreement was executed in November 2019, any such actions were taken by Patrick before the Agreement was even executed. Thus, these other obligations—which do not appear in the Agreement and were completed prior to the Agreement's execution—cannot inform our interpretation of the word "maintained" in the Agreement. We further note that Erin's argument would require us to look to extrinsic evidence for interpretation of "maintained," which we cannot do when, as here, the term is

unambiguous. *See **Tang v. C.A.R.S. Prot. Plus, Inc.***, 2007 WI App 134, ¶¶28-29, 301 Wis. 2d 752, 734 N.W.2d 169.

¶16     In a related argument, Erin relies on the following dictionary definition of "maintain:"  "to keep in an existing state (as of repair, efficiency, or validity):  preserve from failure or decline."  *Maintain*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/maintain (last visited March 15, 2023).  Erin argues, "Based on that plain meaning, Patrick had the obligation to ensure that the Prudential Policy was kept in a valid state during the term of the Agreement."  As stated above, however, Patrick had no duty under the Agreement to maintain insurance on his own life; that obligation belonged to Erin.  And, consistent with the dictionary definition Erin offers, Erin's payment of the premiums kept the policies on Patrick's life (including the Prudential Policy) "in an existing state" and "preserve[d] [them] from failure or decline."

¶17     Separately, Erin relies on two cases from other jurisdictions for his argument that Patrick's suicide constituted a breach of the Agreement:  ***Tintocalis v. Tintocalis***, 25 Cal. Rptr. 2d 655 (Cal. Ct. App. 1993), and ***Woytas v. Greenwood Tree Experts, Inc.***, 206 A.3d 386 (N.J. 2019).  ***Tintocalis*** and ***Woytas*** both involved divorce proceedings in which the husbands were required (by a separate court order and a Marital Settlement Agreement, respectively) to purchase and "maintain" life insurance on their own lives so that, in the event of the husbands' deaths, their wives (and in ***Woytas***, the children) would be guaranteed financial support.  ***Tintocalis***, 25 Cal. Rptr. 2d at 657-58; ***Woytas***, 206 A.3d at 388. The husbands subsequently committed suicide, the insurance companies refused to pay the policies' proceeds due to the policies' suicide exclusions, and the wives sought recovery from the husbands' estates.  ***Tintocalis***, 25 Cal. Rptr. 2d at 657; ***Woytas***, 206 A.3d at 388. The appellate courts in both cases agreed with the wives, determining that, by

committing suicide within the policies' exclusionary periods, the husbands had breached their obligations to maintain life insurance. *Tintocalis*, 25 Cal. Rptr. 2d at 658-59; *Woytas*, 206 A.3d at 393.

¶18 Not only are these cases from other jurisdictions not controlling, they are also not on point. Unlike the instant case, in both *Tintocalis* and *Woytas*, the decedents were expressly required to maintain insurance on their own lives. In contrast, Patrick had no obligation to maintain insurance on his own life under the Agreement; rather, his obligation was to maintain insurance on Erin's life. Erin does not suggest that Patrick failed to maintain any policies on Erin's life, the only policies that the Agreement required him to maintain. Thus, neither *Tintocalis* nor *Woytas* lends support to Erin's interpretation of the Agreement.

¶19 In sum, we conclude that "maintain" under the Agreement unambiguously means to own and pay premiums on the life insurance policies on the other shareholder's life. The Agreement did not impose an additional obligation on Patrick to refrain from committing suicide. Thus, the circuit court properly concluded that Patrick's suicide did not constitute a breach of the Agreement.[4]

---

[4] Because we affirm the circuit court on the ground that Patrick did not breach the Agreement by committing suicide, we need not discuss Alison's other arguments in support of the court's decision. *See Barrows v. American Fam. Ins. Co.*, 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d 508 (2013) ("An appellate court need not address every issue raised by the parties when one issue is dispositive.").

## CONCLUSION

¶20    For the reasons stated, we affirm the circuit court order granting summary judgment to Alison on Erin's counterclaim and dismissing Erin's counterclaim.

*By the Court.*—Order affirmed.