COURT OF APPEALS
DECISION
DATED AND FILED

July 27, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2020AP877**

Cir. Ct. No.  **2017CV277**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

RACHEL SLABEY,

PLAINTIFF-APPELLANT,

V.

DUNN COUNTY, WISCONSIN, DENNIS P. SMITH, BRENDA LAFORTE, MARSHALL L. MULTHAUF AND PAUL GUNNESS,

DEFENDANTS-RESPONDENTS,

DUNN COUNTY SHERIFF'S OFFICE, RYAN BOIGENZAHN, JOHN DOE ONE, JOHN DOE TWO AND JOHN DOE THREE,

DEFENDANTS,

WISCONSIN COUNTY MUTUAL INSURANCE CORPORATION,

INTERVENOR.

APPEAL from a judgment of the circuit court for Dunn County: MAUREEN D. BOYLE, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Seidl, JJ.

¶1    HRUZ, J.  Rachel Slabey appeals a grant of summary judgment in favor of Dunn County ("the County"), Dennis Smith, Brenda LaForte, Marshall Multhauf, and Paul Gunness (collectively, the "Individual Defendants," and together with the County, the "County Defendants"), dismissing her claims under 42 U.S.C. § 1983 (2018).[1]  Slabey was sexually assaulted by correctional officer Ryan Boigenzahn while she was incarcerated in the Dunn County Jail.  The circuit court dismissed Slabey's complaint after determining there was no evidence upon which a reasonable fact finder could rely to conclude the County Defendants were deliberately indifferent to a substantial risk that Boigenzahn would sexually assault an inmate.

¶2    Slabey challenges that determination on appeal, asserting it was sufficient that the County had notice of prior disciplinary conduct involving Boigenzahn and, therefore, the County must have known that its policies forbidding fraternization and sexual contact with inmates were insufficient to protect inmates.  We disagree, as the prior conduct (for which Boigenzahn was temporarily suspended) was not of a sexual nature.  We also reject Slabey's arguments that the circuit court erred by dismissing her claims against Dunn County Sheriff Dennis Smith in his personal capacity.  Accordingly, we affirm.

## BACKGROUND

¶3    Dunn County employed Boigenzahn as a correctional officer between April 2011 and May 2016.  While on duty at the Dunn County Jail on

---

[1]  All references to the United States Code are to the 2018 version unless otherwise noted.

March 25, 2016, Boigenzahn entered Slabey's dorm room and lingered there, talking to her and her cellmate for a considerable period of time. He then sexually assaulted Slabey while she was in the top bunk by touching her genital area underneath her clothing. The general area of the dorm room was under video surveillance, but the area where the assault occurred was outside of camera view.

¶4 Although Slabey did not immediately report the sexual assault, Boigenzahn was terminated from his employment in May 2016 after receiving a romantic note from another inmate without disclosing his receipt of that communication. When Slabey learned of Boigenzahn's termination, she reported the sexual assault that had occurred in March. Boigenzahn was later charged in Dunn County case No. 2016CF216, and he was convicted of second-degree sexual assault by a correctional staff member, in violation of WIS. STAT. § 940.225(2)(h) (2019-20).[2]

¶5 In 2017, Slabey commenced the present action against various parties, including the County and Smith. Slabey sued Smith both in his personal capacity and in his capacity as the sheriff. Chief deputy sheriffs Paul Gunness and Marshall Multhauf, and the captain of the Dunn County Jail, Brenda LaForte, were also sued in their personal and official capacities.

¶6 As relevant here, Slabey brought Eighth and Fourteenth Amendment claims under 42 U.S.C. § 1983, alleging that: (1) the conditions of her confinement exposed her to a substantial risk of harm; (2) the lack of appropriate correctional policies and training amounted to deliberate indifference to her civil

---

[2] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

rights; and (3) the failure to protect her from unreasonable harm constituted a substantive due process violation. Slabey sought monetary damages, as well as declarative and injunctive relief in the form of training and policy changes.

¶7      The County Defendants filed a summary judgment motion seeking the dismissal of Slabey's claims. The circuit court noted it was undisputed that Boigenzahn had received training regarding sexual misconduct, and also that he had been disciplined in a prior instance when he had violated the jail's fraternization policy in 2015. Nonetheless, the court determined that no reasonable fact finder could conclude that the County Defendants should have inferred "that Boigenzahn's [prior violations] would escalate to sexual assault" or that they demonstrated deliberate indifference to the risk that Boigenzahn would commit sexual assault. The court also concluded that "[t]here is no evidence that [the County's] training practices were constitutionally deficient and that the County was aware of the deficiency and failed to abate the deficiency. Boigenzahn simply disregarded all of the training and policies when he made the decision to assault Slabey." Finally, the court determined there was no evidence demonstrating that the Individual Defendants were personally involved in the assault on Slabey, and, in any event, the County Defendants were entitled to qualified immunity. Slabey now appeals.

## DISCUSSION

¶8      We review a grant of summary judgment de novo. *Chapman v. B.C. Ziegler & Co.*, 2013 WI App 127, ¶2, 351 Wis. 2d 123, 839 N.W.2d 425. Summary judgment must be granted if the pleadings, depositions, answers to interrogatories, admissions and affidavits demonstrate that there is no genuine

issue as to any material fact and that the moving party is entitled to judgment as a matter of law. WIS. STAT. § 802.08(2).

¶9    We apply the same two-step summary judgment methodology as the circuit court. *Chapman*, 351 Wis. 2d 123, ¶2. We first examine the pleadings to determine whether a claim has been stated and whether the pleadings join issue. *Id.* If so, we examine the parties' evidentiary submissions to determine whether there are any genuine issues of material fact. *Id.* Evidentiary materials, including the inferences to be drawn from them, are viewed in the light most favorable to the nonmoving party. *AccuWeb, Inc. v. Foley & Lardner*, 2008 WI 24, ¶16, 308 Wis. 2d 258, 746 N.W.2d 447.

## I.  Municipal Liability

¶10    Title 42 U.S.C. § 1983 authorizes private parties to bring suit against government entities and officials who violate their federal constitutional rights while acting under color of state law.[3]  Official-capacity suits against officers and officials are generally treated as suits against the entity. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). A proper analysis of local government liability under 42 U.S.C. § 1983 requires that we consider two separate issues. We must first ascertain whether the plaintiff's harm was caused by a constitutional violation.

---

[3]  Title 42 U.S.C. § 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

*Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992). If so, we must then determine whether the municipality is responsible for that violation. *Id.*

¶11 There are two constitutional predicates upon which Slabey relies. The first is the Eighth Amendment's prohibition on cruel and unusual punishment, which encompasses treatments that are incompatible with "evolving standards of decency" or that involve the "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (citations omitted). The second is the Fourteenth Amendment's guarantee that a person will not be deprived of life, liberty or property without due process, which has been held to include a guarantee that "when the State takes a person into its custody and holds [the person] there against his [or her] will, the Constitution imposes upon it a corresponding duty to assume some responsibility for [the person's] safety and general well-being." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989). As a practical matter, though, there is little difference between the standards developed to effectuate these two constitutional provisions. *Mayoral v. Sheahan*, 245 F.3d 934, 938 (7th Cir. 2001).

¶12 To demonstrate a constitutional violation related to the conditions of her confinement, Slabey needed to present evidence at the summary judgment stage that would allow a fact finder to reasonably conclude that one or more prison officials displayed a "deliberate indifference" to a substantial risk of serious harm to her. *See Farmer v. Brennan*, 511 U.S. 825, 828, 834 (1994). Deliberate indifference requires: (1) an objective showing that the person was incarcerated under conditions imposing a serious risk of harm; and (2) knowledge of, and disregard for, the risk on the part of the defendants. *Palmer v. Marion Cnty.*, 327 F.3d 588, 593 (7th Cir. 2003).

¶13 Deliberate indifference requires more than a showing of mere negligence. *Farmer*, 511 U.S. at 835. The second prong is subjective and requires that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Id.* at 837. In other words, the official must have actual knowledge of the risk of harm in order to be considered to have acted with callous disregard for the prisoner's rights. *See Lewis v. Richards*, 107 F.3d 549, 554 (7th Cir. 1997). To draw the required inference, there must be a strong likelihood, rather than a mere possibility, that harm will come to the prisoner. *Pinkston v. Madry*, 440 F.3d 879, 889 (7th Cir. 2006).

¶14 As a result, we must examine what was known to Dunn County jail officials prior to Boigenzahn's sexual assault of Slabey. It is undisputed that Boigenzahn was, at the time of the assault, certified as a jail officer by the Law Enforcement Standards Board. It is also undisputed that the jail had in place the following written policies: (1) Policy No. 200-17-0, which prohibited correctional staff from fraternizing or having a relationship with inmates (including personal contacts and communication or social, physical or romantic relationships); and (2) Policy No. DC1700.5, which prohibited sexual misconduct, including "indecent, profane or abusive language or gestures, inappropriate visual surveillance of inmates, making sexually offensive comments or gestures, [or] engaging in physical conduct of a sexual nature with an inmate."

¶15 Boigenzahn acknowledged as recently as December 2015 that he had read and understood the sexual misconduct policy. He also received regular training on jail policies. Indeed, Boigenzahn had received training in the days immediately preceding his assault on Slabey that included a briefing on the provisions of the Prison Rape Elimination Act of 2003 ("PREA"), a law intended

to deter the sexual abuse of prisoners. *See* 34 U.S.C. §§ 30301-30309. The briefing discussed four recent Wisconsin cases involving sexual contact between correctional staff and inmates—all in other counties—and noted "[t]here aren't any reports of inmate-inmate sexual assaults or staff sexual misconduct" in Dunn County. The materials reminded attendees that sexual contact between staff and inmates was both a violation of administrative law and a criminal offense.

¶16 Slabey primarily focuses on "multiple allegations of Boigenzahn's policy violations" prior to the March 25, 2016 assault. On August 6, 2015, Beth Mittelstadt, an inmate, informed sergeant Douglas Ormson that another correctional officer was "too chummy with some of the females, especially Inmate [Angela] Draxler." She stated that she thought the officer was "in danger of 'crossing the line.'" Ormson confirmed Mittelstadt was speaking about Boigenzahn, and he asked her to elaborate.

¶17 Mittelstadt told Ormson that she had witnessed Draxler playfully slap Boigenzahn on the chest while the two were speaking in the dorm. Mittelstadt did not believe anything else had happened between them, but she said that "if there was an opportunity where there were no cameras around she felt something might happen." Mittelstadt noted that Boigenzahn seemed willing to talk to female inmates and speculated that because he was young, he might like their attention. Ormson again asked if Mittelstadt had witnessed or heard rumors of any type of sexual relationship between inmates and Boigenzahn, and she said "she hadn't but again said her feeling was that was a possibility if things progressed." She stated Boigenzahn was a good officer but appeared to be "playing favorites" amongst the inmates.

¶18    Following Mittelstadt's report, Ormson discussed the matter with sergeants Michael Owens and Rachel Vold. Owens advised Ormson that he had filed an incident report on July 31, 2015, regarding a complaint by inmate Jana Weaver-Blume. Weaver-Blume suggested that Owens "keep a close eye" on the male correctional officers. Owens asked if an officer was developing a relationship with an inmate, and Weaver-Blume responded, "[N]o, nothing like that." She instead told Owens that one of the officers—she later confirmed it was Boigenzahn—was helping pass notes between a male inmate and a female inmate. Weaver-Blume said she had witnessed Boigenzahn enter the female inmate's cell, which she thought was "weird." He appeared to have something in his hand, which he placed in the cell door, and the inmate picked it up. Weaver-Blume had previously witnessed Boigenzahn place some request slips under the inmate's cell door with messages from a male inmate. Owens reviewed camera footage and saw Boigenzahn enter the female inmate's cell, but he did not notice anything out of the ordinary. Owens also listened to the relevant inmates' phone conversations placed from the jail and determined that "[n]one of the lengthy conversations revealed any indication that an officer was involved in helping them communicate." In all, Owens concluded the allegation was factually unsupported.

¶19    Sergeant Vold investigated Mittelstadt's allegations of improper conduct between Draxler and Boigenzahn. Vold began by reviewing two weeks of camera footage. She discovered two incidents that raised concern. The first incident occurred on July 29, 2015, when Boigenzahn was in the dorm providing inmates with medications. Boigenzahn was outside of camera range for a few minutes, then returned to the camera view when another officer entered with the inmates' breakfast. As Draxler grabbed her breakfast bag, Boigenzahn "reach[ed]

out with his foot and step[ped] on her foot. She then step[ped] back on his foot. It appear[ed] to be something done in a playful sort of manner."

¶20 The second recorded incident that Vold observed occurred on August 6, 2015, when Boigenzahn entered the dorm area with an officer in training. After the other officer left, Boigenzahn propped the dorm door shut and gestured with his head and right arm, as if motioning to someone to come in his direction. Draxler then came running to Boigenzahn. It was unclear from the video why Boigenzahn had motioned to Draxler, but as she walked away from him she brushed his shoulder and chest area with her hand. Boigenzahn then stood in the dorm for a few minutes before leaving.

¶21 Based upon the surveillance footage, captain LaForte directed Vold to interview Draxler. Vold advised Draxler that there should never be physical contact between inmates and jail staff. Upon further questioning, Draxler stated that Boigenzahn made her feel uncomfortable. She told Vold that three months earlier, she and Boigenzahn had accidentally bumped hands. Draxler apologized to Boigenzahn and pulled her hand back, and Boigenzahn responded that "it was alright" and he "didn't mind." Draxler stated that other female inmates had told her Boigenzahn seemed to be "obsessed with her" and he would sometimes stand and watch her sleep. She stated he sometimes "just lingered too long." Vold asked Draxler if there had ever been any conduct other than Boigenzahn's statements or watching her that made her feel uncomfortable, and Draxler said no. Vold then forwarded her report to LaForte.

¶22 LaForte and chief deputy Gunness interviewed Boigenzahn on August 10, 2015, about the allegations and investigation. Boigenzahn initially denied passing notes between inmates, but he admitted to doing so when he was

reminded that being untruthful would result in termination. Boigenzahn was shown the surveillance footage of his interactions with Draxler. Boigenzahn denied engaging in inappropriate conduct with Draxler and explained he tried to have cooperation or a rapport with inmates, but he stated he understood he needed to be sterner if an inmate were to touch him. Boigenzahn stated he made a "dumb mistake" passing the note and it would not happen again.

¶23 Following the investigation, Gunness concluded that Boigenzahn had violated the jail's fraternization and unbecoming conduct policies by his interactions with Draxler on July 29 and August 6, 2015, and by his passing of notes from a male inmate to a female inmate. As a result, he was suspended for three days without pay on August 26, 2015. Boigenzahn was also warned that if he failed to "observe all the rules and procedures of [his] job," he would "subject [him]self to further disciplinary action, including discharge and termination of [his] employment with the County." It is undisputed that no misconduct was observed by, or reported to, jail officials either prior to the July 29, 2015 incident or after Boigenzahn's discipline in August 2015.

¶24 In Dennis Smith's eighteen years as Dunn County sheriff, there had not been any prior incidents of "sexual interaction between a [correctional officer] and an inmate." A correctional officer had previously been found to have violated the fraternization policy based upon intimate conduct with an inmate who had been released, but no misconduct occurred at the jail. That officer resigned rather than face discipline. Similarly, two female correctional officers had also previously resigned for violations of the fraternization policy. One officer resigned after an investigation into note passing revealed that she had been visiting a former Dunn County inmate after he was transferred to another county's jail. The other officer resigned after she was discovered to have been in a car with an

inmate in the jail's parking lot. Smith testified that violations of the fraternization policy usually result in termination, but that he considered "the whole circumstances" when determining the appropriate punishment.

¶25 The circuit court correctly concluded that there was insufficient evidence to support a determination in Slabey's favor under the "deliberate indifference" standard. Taking all of the facts in the light most favorable to Slabey, no reasonable fact finder could conclude there was a serious risk that Boigenzahn's conduct would escalate to the sexual assault of an inmate. Although Mittelstadt had vaguely alluded to the possibility that Boigenzahn's conduct might cross a line, and Weaver-Blume suggested that staff "keep a close eye" on Boigenzahn, their comments did not suggest or indicate any sexual misconduct by Boigenzahn. Indeed, both inmates denied that they were aware of any improper relationships between inmates and jail staff. Jail officials were aware that Boigenzahn was somewhat flirtatious and would linger around female inmates, making them feel uncomfortable. Jail staff investigated these inmate concerns and discovered two recorded instances of seemingly "playful" physical contact between Draxler and Boigenzahn—conduct that, though proscribed, was not inherently sexual in nature, and certainly not akin to the assault Boigenzahn ultimately inflicted upon Slabey.

¶26 Slabey contends that the physical contact between Draxler and Boigenzahn was, in fact, a violation of the jail's sexual misconduct policy. She alleges that the only reason there was no documentation of sexual misconduct violations was because "Dunn County minimized and deliberately mischaracterized Boigenzahn's conduct." As Slabey notes, though, the policy defined sexual misconduct in broad terms, prohibiting not just sexual contact but also a range of behaviors including "inappropriate remarks, sexualized

12

name-calling, correspondence, conversations, [and] inappropriate displays." That some of Boigenzahn's conduct could arguably be categorized as "sexual misconduct" for purposes of a jail policy is not a fact from which a reasonable fact finder could conclude that the County was deliberately indifferent to a serious risk that Boigenzahn would commit sexual assault against an inmate.

¶27 Moreover, it is undisputed that Boigenzahn was punished for his fraternization violations. He was suspended for three days without pay and reminded of his obligations under jail policy. After his suspension, there were no further instances of misconduct observed by, or reported to, jail officials. Boigenzahn also continued to receive various training, including watching a PREA training video and completing a quiz in November 2015, reading and acknowledging his understanding of the sexual misconduct policy in December 2015, and attending a meeting with the County's corporation counsel that included PREA training in March 2016. Even assuming that jail officials did view Boigenzahn's conduct as creating a substantial risk of harm to female inmates, liability cannot be imposed "if they responded reasonably to the risk, even if the harm ultimately was not averted." *See* **Farmer**, 511 U.S. at 844.

¶28 Slabey highlights several things she believes jail officials could have done to prevent her sexual assault. For example, she contends jail officials could have increased Boigenzahn's supervision, more thoroughly investigated his conduct, or terminated his employment. But the question is not whether jail officials might have taken some other course of action that would have ensured Slabey's safety. Rather, we assess whether the actions the officials actually took evidenced a deliberate indifference to a serious risk of harm of which they were aware. Merely pointing out that more could have been done does not necessarily demonstrate that the measures the County did take were unreasonable.

13

¶29 Slabey also notes that Boigenzahn did, in fact, engage in further flirtatious and sexual misconduct with an inmate after he was suspended in August 2015, but before her assault. During his deposition, Boigenzahn acknowledged flirting with a female inmate, which eventually resulted in her sending him topless photographs after she was released. There is no evidence, however, that the County was or should have been aware of this incident. Accordingly, it is not evidence from which a reasonable fact finder could conclude the County was deliberately indifferent to any serious risk of harm that Boigenzahn presented.

¶30 Circumstantial evidence can be used to establish subjective awareness and deliberate indifference. *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 302 (7th Cir. 2010). But here, even the circumstantial evidence Slabey has offered is insufficient to support a determination that the County was deliberately indifferent to a substantial risk that Boigenzahn would sexually assault an inmate. Nor is this a case where the "single-incident" theory of liability is appropriate, and no risk of constitutional harm was "so obvious," as amicus Wisconsin Association for Justice contends. Only in rare instances can liability based on a failure to train or supervise be predicated on an obvious risk without proof of a pre-existing pattern of violations. *See Connick v. Thompson*, 563 U.S. 51, 64 (2011).

¶31 Slabey argues that this case is factually analogous to two federal court decisions which upheld jury verdicts finding municipal liability based upon sexual assaults of inmates by correctional staff. *See Cash v. County of Erie*, 654 F.3d 324 (2d Cir. 2011); *J.K.J. v. Polk Cnty.*, 960 F.3d 367 (7th Cir. 2020) (en banc), *cert. denied sub nom.*, *Polk Cnty., Wis. v. J.K.J.*, 141 S. Ct. 1125 (2021). In *Cash*, the Second Circuit determined that there was sufficient evidence of

deliberate indifference to the risk of a sexual assault based on a single prior allegation of sexual contact between a correctional officer and an inmate approximately three years prior. *Cash*, 654 F.3d at 336, 345. The court held that this prior instance of alleged sexual contact should have "alerted defendants that they could not rely simply on [correctional officers'] awareness of a no-tolerance policy to deter sexual misconduct." *Id.* at 336. Moreover, the court held that even though the allegation may have involved less-egregious sexual contact than rape, the allegation was sufficient to demonstrate to correctional officials that their policies were inadequate to safeguard the inmates under their care. *Id.* at 337. The court noted expert testimony adduced at trial that highlighted the risk of "unmonitored one-on-one interactions" between male correctional staff and female inmates. *Id.* at 338.

¶32 *Cash* is factually distinct from Slabey's case for two material reasons. First, *Cash* involved prior allegations of sexual behavior by correctional officers in the respective jail, one of whom later sexually assaulted an inmate. *Cash*, 654 F.3d at 336-37. The investigation revealed that "at best," a female inmate repeatedly engaged in sexual exhibitionism in front of various correctional officers, all of whom failed to report the activity and some of whom may have paid for it. *Id.* at 336. Despite the inmate's "dubious credibility," the investigators thought it likely that prohibited sexual activity occurred. *Id.* Unlike in *Cash*, Slabey has not identified any previous instances of sexual behavior in the Dunn County Jail. As previously discussed, none of the previous instances of fraternization by other correctional officers in the Dunn County Jail involved sexual behavior within the jail. Moreover, Boigenzahn's previous conduct—note passing, playfully touching his foot to an inmate's foot, and allowing an inmate to brush his chest—was not inherently sexual in nature.

15

¶33　***Cash*** is also distinguishable because the plaintiff in ***Cash*** presented expert testimony regarding the defendants' need to prohibit unmonitored one-on-one interactions between correctional officers and inmates, and how the previous allegations of sexual activity should have alerted the defendants that current policies were inadequate. ***Id.*** at 338. Slabey, however, did not submit any expert evidence in opposition to summary judgment that the County's policies were inadequate to prevent sexual assault. Nor did she submit any evidence that the previous fraternization allegations in the County should have alerted the County to any alleged inadequacies in the County's policies involving sexual misconduct.

¶34　***J.K.J.*** also involved circumstances markedly different from those here. In ***J.K.J.***, two female plaintiffs endured repeated sexual assaults at the hands of Polk County correctional officer Darryl Christensen over the course of three years. ***J.K.J.***, 960 F.3d at 370-71. The court determined that sufficient evidence existed to "conclude that Polk County deliberately chose a path of inaction when that option was off the table." ***Id.*** at 384. In reaching this conclusion, the court discussed the inherent risk of sexual assault that female inmates face, but it also emphasized Polk County's awareness of sexual misconduct happening within its jail, rendering the risk of sexual assault "far from hypothetical." ***Id.*** at 382.

¶35　Specifically, the jury in ***J.K.J.*** heard testimony regarding the jail's culture and how a captain of the jail—someone responsible for creating and implementing the jail's policies and standards—knew about, and participated in, inappropriate talk about female inmates. ***Id.*** The jury also heard testimony that Polk County knew of a different correctional officer who sexually exploited a female inmate by watching her shower, asking her to expose herself, and forcibly touching her in a sexual manner. ***Id.*** In response to the officer's conduct, Polk

16

County issued a written reprimand, but it assured him that it was "not a big deal." *Id.* at 383. With knowledge of sexual exploitation in the jail, Polk County "did not change its sexual abuse policy, institute a training, inquire of female inmates, or even call a staff meeting." *Id.* Even if Polk County believed its policies and training to be adequate—and an expert testified they were not—the court concluded that such belief was untenable after learning about the other correctional officer's sexual misconduct. *Id.*

¶36    Unlike in *J.K.J.* where the correctional officer's assaults persisted for three years without detection or prevention, *id.* at 371, Slabey has not identified any previous sexual abuse by Boigenzahn toward her or any other inmate. Moreover, at the same time the sexual assaults occurred in *J.K.J.*, Polk County knew of another correctional officer engaging in sexual misconduct by watching an inmate shower and forcibly touching her waist and buttocks. *Id.* at 372-73, 382. Again, Slabey did not identify any previous instances of known sexual abuse or misconduct by a correctional officer in Dunn County. Finally, the court in *J.K.J.* relied on the jail's culture and how sexually inappropriate banter between correctional officers—conduct known to Polk County—demonstrated an undeniable risk that a correctional officer would grow too comfortable and step over the clear line in the written policies. *Id.* at 382. Slabey did not submit any analogous evidence of a known, concerning culture among correctional officers in Dunn County that would be conducive to an officer violating written policies against sexual misconduct so as to lead to the strong likelihood that Boigenzahn would commit a sexual assault.

¶37    Slabey next argues the circuit court erred by making findings on disputed issues of fact. She fails to highlight, however, any disputed factual issues, citing only to her memorandum opposing the summary judgment motion,

17

which is not evidence. *See **State v. Bean***, 2011 WI App 129, ¶24 n.5, 337 Wis. 2d 406, 804 N.W.2d 696 ("Trial court briefs are not evidence."). We do not consider issues supported by only general statements. ***State v. Pettit***, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992). In any event, as noted above, our review on a grant of summary judgment considers the facts in the light most favorable to the non-moving party, ***AccuWeb, Inc.***, 308 Wis. 2d 258, ¶16, which we have done here. On this record, Slabey's claim fails as a matter of law.

¶38 In ***Monell v. Department of Social Services of City of New York***, 436 U.S. 658, 690-91 (1978), the Supreme Court concluded that municipalities and other local government units can be liable under 42 U.S.C. § 1983, though not under a respondeat superior theory. All told, to establish the County's liability, Slabey must prove that: (1) she suffered a deprivation of a federal right; (2) as a result of either an express municipal policy, widespread custom, or deliberate act of a decision-maker with final policy-making authority for the County; which (3) was the proximate cause of her injury. *See **Ienco v. City of Chicago***, 286 F.3d 994, 998 (7th Cir. 2002).

¶39 A substantial portion of Slabey's arguments is directed toward establishing that there was an informal custom or policy of ignoring dangers to female inmates, so as to make the County liable under 42 U.S.C. § 1983. Although Slabey undoubtedly suffered serious harm during her confinement, she has not presented facts upon which a reasonable fact finder could conclude that officials acted with deliberate indifference to the risk of that harm. Accordingly, the County cannot be deemed responsible for the alleged Eighth and Fourteenth Amendment violations.

## II. Personal Liability of Sheriff Dennis Smith

¶40    Slabey next argues that Smith is personally liable because he participated in Boigenzahn's discipline and supervision.  When a government official is sued in his or her official capacity, the suit is treated as though it is against the municipality.  *Selerski v. Village of W. Milwaukee*, 212 Wis. 2d 10, 17, 568 N.W.2d 9 (Ct. App. 1997).  "Personal-capacity suits, on the other hand, seek to impose individual liability upon a government officer for actions taken under color of state law."  *Hafer v. Melo*, 502 U.S. 21, 25 (1991).  In a suit seeking the imposition of personal liability, the monetary damages are paid by the individual, not the government.  *Id.* at 27, 30-31.  Accordingly, a plaintiff need not establish that the governmental entity's policy or custom played a role in the violation of federal law, unlike when a plaintiff brings an official-capacity suit.  *Id.* at 25.  A plaintiff must establish, however, that the individual "had some personal involvement in the alleged constitutional deprivation."  *Williams v. Shah*, 927 F.3d 476, 482 (7th Cir. 2019).  An individual cannot be personally liable under a theory of respondeat superior.  *Arnett v. Webster*, 658 F.3d 742, 757 (7th Cir. 2011).

¶41    Oddly, Slabey's argument regarding Smith's personal liability focuses almost exclusively on whether Smith had policymaking authority and what he did with that authority—a question that is irrelevant to a personal-capacity claim.[4]  The cases Slabey cites involve a government's liability under *Monell*, not the personal liability of the government actor.  *See Ball v. City of Indianapolis*,

---

[4] In particular, Slabey notes that Smith was "directly and personally involved in the [C]ounty's decision not to terminate Boigenzahn in August 2015 and not to modify Boigenzahn's work schedule or increase his level of supervision upon his return to work."

760 F.3d 636, 643 (7th Cir. 2014); *Valentino v. Village of S. Chicago Heights*, 575 F.3d 664, 675 (7th Cir. 2009). If Smith is a policymaker for the County, as Slabey contends and the County Defendants concede, then her claim truly does lie against the County, not Smith personally. *See Bradley v. Village of Univ. Park, Ill.*, 929 F.3d 875, 885 (7th Cir. 2019). Accordingly, her claim on this point fails.

### III.  Qualified Immunity

¶42     Slabey also appeals the circuit court's application of qualified immunity. Qualified immunity shields public officials from liability for civil damages if their actions were objectively reasonable, as evaluated in the context of "clearly established" legal rules at the time of the conduct in question. *Poe v. Leonard*, 282 F.3d 123, 132 (2d Cir. 2002). Qualified immunity is purely a function of personal liability; the Supreme Court has authoritatively determined that governmental bodies, as opposed to officials, do not enjoy qualified immunity from actions seeking damages. *Hedge v. County of Tippecanoe*, 890 F.2d 4, 8 (7th Cir. 1989).

¶43     Thus, to the extent the circuit court concluded the County was entitled to qualified immunity, we agree with Slabey and the amicus Wisconsin Association for Justice that such a determination was in error. However, because there was insufficient evidence to create a triable issue regarding the County's liability for Slabey's assault under 42 U.S.C. § 1983, the court's error does not undermine the validity of the court's grant of summary judgment.

¶44     To the extent Slabey argues the circuit court erred by determining that the Individual Defendants were entitled to qualified immunity, we have no need to reach that issue. Again, to establish a personal-capacity claim, the plaintiff

must allege the individual "had some personal involvement in the alleged constitutional deprivation." **Shah**, 927 F.3d at 482.

¶45 Slabey has attempted—albeit unsuccessfully—to demonstrate only that Smith bore some personal culpability in the circumstances that led to her sexual assault. She has not provided any basis on appeal to conclude that any of the other Individual Defendants participated in the alleged deprivation of her constitutional rights. Accordingly, even if the circuit court's qualified immunity determination was in error, Slabey's failure to advance any argument that the remaining government officials were personally involved in the relevant events is fatal to her claims. We therefore need not determine whether the court properly applied qualified immunity to the Individual Defendants.

*By the Court.*—Judgment affirmed.

Not recommended for publication in the official reports.