YATES, Judge.
The Greater Gadsden Housing Authority (“GGHA”), a federally subsidized public housing authority, filed an eviction action in the District Court of Etowah County against Jennifer Sayles. The district court ordered the eviction, and Sayles appealed to the circuit court. Following ore tenus proceedings, the circuit court ordered Sayles evicted. Sayles appeals.
We note that the facts in this case are undisputed; therefore, the ore tenus rule has no application and the duty of this court is to determine whether the trial court properly applied the law to the facts. Ex parte Anonymous, 618 So.2d 722 (Ala.1993).
Sayles became a tenant of GGHA in 1991. At the time of the hearing, she was unmarried and lived in the apartment with her young daughter, and was expecting another child. Sayles’s only income was $137 per month in Aid to Dependent Children. Based on that income, she received from the Department of Housing and Urban Development (“HUD”) a $50 per month utility allow- *490 anee, from which GGHA automatically deducted her $29 per month rent. Consequently, she was left with $21 with which to pay her utility bills.
In September 1991, Sayles’s gas utility service was disconnected because of nonpayment; GGHA counseled her and sent her a notice to vacate. Following an informal hearing, GGHA allowed Sayles to remain a tenant, notifying her that if her gas service was disconnected in the future, she would be sent a notice to vacate and that that notice “will stand with absolutely no exceptions.” On April 15, 1993, Sayles’s gas service was again disconnected because of nonpayment. On April 22, 1993, GGHA notified her that her lease was being terminated. Following an informal hearing on April 26,1993, GGHA sent Sayles a notice to vacate, although her gas service had been restored on April 23.
At that hearing, Sayles testified that she had nowhere to go and that she did not have enough money to pay her gas bill. She went on to state that she wanted to remain a tenant and that her gas service had been restored. Sayles’s March 1993 gas bill was $104. It had snowed that month and temperatures were unseasonably cold. Her water heater, stove, and heater are all gas appliances.
Sayles testified at the hearing before the circuit court that her April 1993 utility allowance cheek was only $7 because, “they [GGHA] took out $14 of it to pay [for] a window.” She further testified that she used her HUD check strictly for utilities, stating, “I put it on my power bill, because that’s what it’s for.”
The lease agreement between Sayles and GGHA provided:
“Tenant shall be responsible for securing utilities ... not provided by Landlord and shall pay directly to the utility provider all deposits and charges necessary to secure and maintain UNINTERRUPTED service. Failure of Tenant to furnish UNINTERRUPTED service because of nonpayment of utilities shall be considered a serious violation of the terms and conditions of this lease.... Tenant agrees to keep sufficient heat in the premises to prevent freezing of piped water_ Tenant will be charged for any damage resulting from failure to maintain sufficient heat in premises or to notify Landlord ... unless for any cause beyond Tenant’s control.”
A public housing tenant may be evicted only for a “serious or repeated violation of material terms of the lease such as the failure to make payments due under the lease ... or for other good cause.” 24 C.F.R. § 966.4(l)(2)(i). The housing director for GGHA testified that no property damage had occurred and that no other residents had been placed in any danger as a result of Sayles’s utility disconnection. We find no cause for the termination of the lease for the short-term disconnection of a utility service that occurred after an approximate two-year period of service. We note that there are no Alabama cases on point.
Here, almost two years had passed since Sayles’s first disconnection of utility service. Further, an income of $137 per month in Aid to Dependent Children, along with a $50 per month utility allowance, from which a $29 rent payment is deducted, does not allow for increased utility bills in the extreme weather months. Sayles testified that during the winter, her gas bill normally averages $50 to $58 per month. The $104 gas bill was the result of the winter storm in March 1993 and Sayles’s inability to completely pay her previous month’s bill. The gas company had required a $77 payment to prevent disconnection; that payment would have required more than one-half of Sayles’s monthly income.
Moreover, the housing director for GGHA testified that she was not familiar with the federal regulation allowing public housing authorities to provide individual relief from hardship in paying excessive utility bills. That regulation provides:
“§ 965.479 Individual relief.
“Requests for relief from Surcharges for excess consumption of ... or from payment of Utility supplier billings in excess of the Allowances for Tenanb-Purchased Utilities, may be granted by the [public housing authority] on such reasonable grounds, such as special needs of elderly, *491 ill or handicapped tenants, or special factors affecting utility usage not within the control of the tenant, as the [public housing authority] shall deem appropriate.... Notice of the availability of such procedures (including identification of the [public housing authority] representative with whom initial contact may be made by tenants), and the [public housing authority’s] criteria for granting such relief, shall be included in each notice to tenants given pursuant to § 965.473(c) and in the information given to new tenants upon admission.”
24 C.F.R. § 965.479 (emphasis added).
Based on the director’s testimony that she was not familiar with that regulation, we can assume that Sayles was not aware of the relief that may have been available to her for her excessive utility bill.
The director testified that GGHA did, in fact, make provisions for excessive utility bills in extreme hot weather. We find this inconsistency noteworthy. The director stated:
“I was going to tell you the procedure we just incorporated. On their power bill that they owe us now, in July and August the weather was so extremely hot that the Board passed an agreement for the resident to sign where they can pay — those utility bills come due and payable in September and October to us, so they’ve passed for us to allow them to sign an agreement if their excess was extremely high, over twenty-five dollars and ... their income is very low. Then we allow them to pay that in four months under our four-month agreement because of the excess weather. Because that would have been a hardship on most of them.”
Given § 965.479, Sayles’s low income, and the other facts of the case, we hold that Sayles’s eviction was error. Accordingly, the judgment of the trial court is reversed.
REVERSED AND REMANDED.
ROBERTSON, P.J., concurs.
THIGPEN, J., dissents.