**COURT OF APPEALS
DECISION
DATED AND FILED**

**August 29, 2024**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.** *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2023AP1018**

**STATE OF WISCONSIN**

Cir. Ct. No. 2023SC294

**IN COURT OF APPEALS
DISTRICT IV**

WATERTOWN HOUSING AUTHORITY,

   PLAINTIFF-RESPONDENT,

 V.

HARRIET KESTER-PALETTI,

   DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Jefferson County: WILLIAM V. GRUBER, Judge. *Reversed*.

¶1 TAYLOR, J.[1] Harriet Kester-Paletti appeals a judgment evicting her from public housing owned by the Watertown Housing Authority ("WHA")

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(a) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted. All references to the Code of Federal Regulations or the United States Code are to the 2023 version unless otherwise noted.

for violating a lease term requiring her to keep her vehicle operable. Kester-Paletti argues, among other things, that the WHA failed to show that she committed a serious or repeated violation of a material term of the lease, as required by 24 C.F.R. § 966.4(*l*)(2)(i). I conclude that the WHA failed to show that the violation was serious or repeated and accordingly, I reverse.

## BACKGROUND

¶2 The following facts are undisputed. The WHA is a public housing authority that owns property in Watertown, Wisconsin. In 2020, Kester-Paletti entered into a lease for a housing unit in a building owned by the WHA, and she signed a lease addendum entitled "Parking Lot/Vehicle Policy" (the "vehicle policy"). The vehicle policy places certain restrictions on use of parking lots at the WHA's property, and the policy's terms include the following:

> 4. Tenants are responsible for keeping their vehicle licensed, operable and free from snow. The WHA reserves the right to have unlicensed, inoperable, snow covered or unused vehicles towed at the tenant's expense. Once the tenant has been officially notified, the tenant will have seven (7) days to move their vehicle, register it and/or repair it if inoperable.

I refer to this provision as the "inoperable vehicle provision." The vehicle policy provides that a violation of its terms "will be considered a violation" of the lease.

¶3 While living in the unit, Kester-Paletti worked as a food delivery driver to support herself and her three children. In the fall of 2022, Kester-Paletti's vehicle broke down. The repair would cost up to $2,700, which she could not afford at that time. A mechanic told her that it was unsafe to drive the vehicle, other than for short distances, until it was repaired.

¶4 Kester-Paletti initially parked her vehicle on the street. However, she was informed by the Watertown police that she could not leave her vehicle on the street during the winter months due to winter parking restrictions that went into effect on October 31, 2022. On that date, Kester-Paletti moved her vehicle to a stall at the "end" of her building's parking lot. She chose that space in an effort to avoid "obstructing anything," and to minimize the extent to which maintenance would be required to "plow around" her vehicle when snowfall occurred.

¶5 The WHA did not communicate any concerns about the vehicle to Kester-Paletti until over three months later when, on February 11, 2023, the WHA served Kester-Paletti with a notice requiring her to cure certain lease violations within 30 days or her tenancy would be terminated. The termination notice informed Kester-Paletti that she had violated the following lease term: "Inoperable vehicle in parking lot. Parking Lot/Vehicle Policy #4. - Tenants are responsible for keeping their vehicles licensed, operable and free from snow." The notice also informed Kester-Paletti that she owed outstanding rent and utility charges totaling $2,017.41.

¶6 Kester-Paletti paid the outstanding rent and utility charges, but she did not move her vehicle. She believed that the inoperable vehicle provision violation was not a "serious issue" because she had parked her vehicle "out of the way" and because the WHA had waited so long to raise concerns. Additionally, because the police had told her that she could not park on the street, she believed she had "no choice" but to leave the vehicle where it was.

¶7 On March 20, 2023, the WHA brought this eviction action based solely on the alleged violation of the inoperable vehicle provision. Kester-Paletti moved to dismiss the complaint, arguing that the tenancy termination notice was

defective because it failed to comport with due process requirements. The circuit court held an eviction hearing, during which it denied Kester-Paletti's motion to dismiss. As discussed in greater detail below, to prevail, the WHA was required to show that Kester-Paletti's violation of the inoperable vehicle provision was a "serious or repeated violation" of a "material" term of the lease under 24 C.F.R. § 966.4(*l*)(2)(i). The court determined that the violation was "serious," stating that the violation was "prolonged" and occurred during winter months when snow removal was required. The court entered a judgment of eviction.

¶8 The next day, the circuit court, sua sponte, scheduled a reconsideration hearing. After that hearing, the court again determined that the WHA was entitled to eviction. In its ruling, the court questioned the "seriousness" of the inoperable vehicle violation, but determined that it was a "repeated violation" of a "material provision" of the lease.

### DISCUSSION

¶9 Kester-Paletti argues that the circuit court's decision should be reversed because the tenancy termination notice was defective on various grounds and because the court erroneously determined that she committed a serious or repeated violation of a material term of the lease.[2] I conclude that Kester-Paletti's lease violation was neither serious nor repeated, and reverse. I do not, therefore, address Kester-Paletti's arguments regarding the termination notice. *See Barrows v. American Fam. Ins. Co.*, 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d

---

[2] This court also received an amicus brief by the National Housing Law Project ("NHLP") arguing that the eviction judgment should be reversed.

508 (2013) ("An appellate court need not address every issue raised by the parties when one issue is dispositive.").

¶10 The parties agree that the lease at issue is for government-subsidized housing owned by a public housing authority.[3] Accordingly, the lease is governed by the terms of the United States Housing Act of 1937, codified in 42 U.S.C. §§ 1437 through 1437z-10 (2023). *See Allegheny Cnty. Hous. Auth. v. Johnson*, 2006 PA Super 258, ¶11, 908 A.2d 336. The Housing Act's stated purposes include remedying "the unsafe housing conditions and the acute shortage of decent and safe dwellings for low-income families[.]" 42 U.S.C. § 1437(A).

¶11 The right "to continue to live in subsidized housing is an important right," *Johnson*, 2006 PA Super 258, ¶20, and "[e]viction is hardly consistent with [the] public interest in providing housing for low income persons," *Housing Authority of City of Milwaukee v. Mosby*, 53 Wis. 2d 275, 284, 192 N.W.2d 913 (1972). Consistent with these principles, a public housing authority must use leases that set a high bar for eviction. Such leases must provide that the public housing authority may only terminate the tenancy "for serious or repeated violation of the terms or conditions of the lease or for other good cause[.]" 42 U.S.C. § 1437d(*l*)(5); *Johnson*, 2006 PA Super 258, ¶11. The purpose of this standard is "to protect tenants in publicly financed housing from arbitrary eviction." *Housing Auth. of Portland v. Asana*, 165 Or. App. 531, 537, 1 P.3d

---

[3] Although not expressly stated anywhere in the record or the briefing, the law cited by the parties applies only in the government-subsidized housing context. Because the parties presumably agree on this point, I assume without deciding that the eviction here involves the application of federal law that applies to government-subsidized housing as set forth on appeal by both parties under the United States Housing Act of 1937, codified in 42 U.S.C. §§ 1437 through 1437z-10 (2023).

1025 (2000). Federal regulations further specify that a public housing authority "may terminate the tenancy only for," among other things, a "[s]erious or repeated violation of material terms of the lease."[4]  24 C.F.R. § 966.4(*l*)(2)(i); *see also Johnson*, 2006 PA Super 258, ¶11.

¶12    The parties agree that the WHA must meet the "serious or repeated violation of material terms of the lease" standard set forth in 24 C.F.R. § 966.4(*l*)(2)(i) to show that it is entitled to eviction, and that I may determine the meaning of this standard as a matter of statutory interpretation.[5]  *See County of Milwaukee v. Superior of Wis., Inc.*, 2000 WI App 75, ¶11, 234 Wis. 2d 218, 610 N.W.2d 484 (the rules of statutory construction also apply to the interpretation of administrative regulations).  "Statutory interpretation is a question of law" reviewed de novo. *Nowell v. City of Wausau*, 2013 WI 88, ¶19, 351 Wis. 2d 1, 838 N.W.2d 852.  The parties do not identify facts in dispute and they agree that I can determine whether the facts here fulfill the "serious or repeated violation of material terms of the lease" legal standard.  Application of a set of facts to a legal standard is a question of law reviewed de novo. *State v. Brandt*, 226 Wis. 2d 610, 618, 594 N.W.2d 759 (1999).[6]

---

[4] 24 C.F.R. § 966.4(*l*)(2) also permits termination of a tenancy for "[b]eing over the income limit for the program," "[n]o longer meeting the restrictions on net assets and property ownership," and "[o]ther good cause."  The WHA does not rely on any other ground for termination listed in 24 C.F.R. § 966.4(*l*)(2) here.

[5] The lease does not actually contain the language required by 24 C.F.R. § 966.4(*l*)(2)(i).  Rather, the lease provides that the WHA may generally terminate the tenancy based on "[t]he tenant's material noncompliance" with the lease or for other good cause.  The parties do not address any legal implications of the WHA's failure to use the required language; rather, they appear to agree that the proper course of action is to proceed as though the required language is, in fact, in the lease.  I follow the parties' lead and do so as well.

[6] Generally in an eviction, the landlord bears the burden to prove a lease violation by the greater weight of the credible evidence. *See* WIS JI—CIVIL 3094.  The parties do not address

(continued)

¶13     As noted, 24 C.F.R. § 966.4(*l*)(2)(i) permits the WHA to terminate a tenancy for a "serious or repeated" violation of a "material" term of the lease. Kester-Paletti does not contest that she violated the inoperable vehicle provision. The parties' arguments focus on whether this provision is a "material" term of the lease, and, if so, whether Kester-Paletti's violation of this provision was "serious" or "repeated." The parties cite no case that directly addresses the meaning of "serious," "repeated," or "material" as those words are used in the regulation, although they do cite multiple cases applying this standard generally. I discuss two such cases that I consider instructive.

¶14     In *Sayles v. Greater Gadsden Housing Authority*, 658 So.2d 489 (Ala. Civ. App. 1994), a public housing authority sought to evict Sayles after her gas utility service was disconnected for nonpayment, in violation of a lease term requiring Sayles to maintain uninterrupted utility service. *Id.* at 489-90. The *Sayles* court determined that the "serious or repeated violation of material terms of the lease" standard set forth in 24 C.F.R. § 966.4(*l*)(2)(i) had not been met. *Id.* at 490. The court noted that "no property damage had occurred" and "no other residents had been placed in any danger." *Id.* The court also noted that the gas bill was unusually high, and that Sayles' low income made it difficult for her to pay the bill. *Id.*

¶15     In *Johnson*, 2006 PA Super 258, a public housing authority sought to evict Johnson for lease violations based on conduct such as damaging another tenant's door, engaging in "disruptions requiring police intervention," and causing

what burden the WHA must meet to show a "serious or repeated violation of material terms of the lease" under 24 C.F.R. § 966.4(*l*)(2)(i). I need not address this issue because I conclude that the WHA has failed to make this showing regardless of the applicable burden.

a fire hazard by leaving "stove jets and [an] oven pilot running." ***Id.***, ¶17. The court stated that "cases such as this warrant special consideration due to the nature of a tenant's financial status," and that Johnson "may not have the means to find alternate housing if evicted," but that such concerns "cannot override established principles of law and other residents' rights." ***Id.***, ¶12. Noting that Johnson's conduct had disrupted and endangered the lives of other residents, the court determined that his behavior "unequivocally amounted to 'serious or repeated violation[s] of the material terms of the lease.'" ***Id.***, ¶19 (alteration in original).

¶16    Although neither case discussed above directly addresses the meaning of "serious," "repeated," or "material" as used in 24 C.F.R. § 966.4(*l*)(2)(i), both suggest that determining whether a lease violation satisfies this standard generally involves a fact-dependent inquiry into whether, under the circumstances, the violation warrants eviction, weighing the significance of the violation against mitigating facts. *Cf. also* ***Asana***, 165 Or. App. at 538 (reversing eviction of a tenant in public housing because the trial court failed to "go beyond the occurrence of violations and examine their gravity," contrary to 42 U.S.C. § 1437d(*l*)(4)'s requirement that such tenancies be terminated only for "serious or repeated violation of the terms or conditions of the lease or for other good cause"). I consider this fact-dependent inquiry to be in line with the purposes of the regulatory language, which, as noted, is meant to protect tenants in subsidized housing from "arbitrary eviction." ***Asana***, 165 Or. App. at 537.

¶17    I now turn to the language of 24 C.F.R. § 966.4(*l*)(2)(i). "[S]tatutory interpretation 'begins with the language of the statute. If the meaning of the statute is plain, we ordinarily stop the inquiry.'" ***State ex rel. Kalal v. Circuit Ct. for Dane Cnty.***, 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110 (quoting ***Seider v. O'Connell***, 2000 WI 76, ¶43, 236 Wis. 2d 211, 612 N.W.2d 659).

"Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." *Id.*, ¶45. As noted above, these statutory interpretation principles also apply to the interpretation of regulations. *See Superior of Wis., Inc.*, 234 Wis. 2d 218, ¶11.

¶18 I do not consider whether the inoperable vehicle provision is a "material" term of the lease, because, as explained below, assuming it is material, Kester-Paletti's violation was neither "serious" nor "repeated."

### 1. The Tenant's Violation of the Inoperable Vehicle Provision Was Not Serious

¶19 We may use dictionary definitions to determine the meaning of words. *See State v. Marks*, 2022 WI App 20, ¶25, 402 Wis. 2d 285, 975 N.W.2d 238. Black's Law Dictionary defines "serious" as "weighty" or "important." *Serious*, BLACK'S LAW DICTIONARY (12th ed. 2024); *see also Wilhite v. Scott Cnty. Hous. & Redevelopment Auth.*, 759 N.W.2d 252, 256 (Minn. Ct. App. 2009) (applying the Black's Law Dictionary definition of "serious" in interpreting a related federal regulation, 24 C.F.R. § 982.552(b)(2), which requires a public housing authority to terminate the Section 8 benefits of a family evicted for a "serious violation of the lease").

¶20 Considering all the circumstances, Kester-Paletti's violation of the inoperable vehicle provision was not serious; that is, it was not "weighty" or "important." It is true, as the circuit court noted, that the violation was "prolonged"—the vehicle remained on the lot for the entire winter of 2022-23. It is also apparent, as the WHA notes, that "[a] parked car with snow accumulating, melting, and refreezing around it creates an injury risk for other residents of the

complex and exposes the WHA to liability risk for these injuries." However, to the extent that these facts suggest that the violation was particularly weighty or important, they are mitigated by other facts.

¶21 Kester-Paletti left her inoperable vehicle in the parking lot only because she had little choice but to do so—she could not afford to make the substantial repairs the vehicle required to become safely operable, and the police told her that she could not park her vehicle on the street because of winter parking restrictions. She parked her vehicle in what she believed was a stall where it would cause as little obstruction as possible. Significantly, the WHA identifies nothing in the record suggesting that Kester-Paletti did not succeed in minimizing the obstruction; instead, the WHA's response to Kester-Paletti's violation of the inoperable vehicle provision suggests that she did succeed in minimizing any risk her parked vehicle posed. From the date that Kester-Paletti parked her vehicle in the parking lot (October 31, 2022) through the date of the WHA's termination notice (February 11, 2023), the WHA raised no concerns about the vehicle, despite those being peak winter months. If the vehicle were a significant safety hazard, the WHA could have, and presumably would have, taken timely action to remove the vehicle. As noted, the inoperable vehicle provision provides as follows: "The WHA reserves the right to have … inoperable … vehicles towed at the tenant's expense. Once the tenant has been officially notified, the tenant will have seven (7) days to move their vehicle … and/or repair it if inoperable." The WHA could have notified Kester-Paletti that her vehicle was an issue, as contemplated in the inoperable vehicle provision, and could have had the vehicle towed at Kester-Paletti's expense if she did not move the vehicle within seven days. The WHA took no action regarding the vehicle for over three months after the violation commenced, suggesting that Kester-Paletti's vehicle was not an impediment to

maintenance, did not jeopardize the safety of other residents, and did not otherwise pose a serious concern. Kester-Paletti's violation of the inoperable vehicle provision was therefore not "weighty" or "important," and not "serious" as set forth in 24 C.F.R. § 966.4(*l*)(2)(i).

¶22 The WHA does not appear to make any clear argument that the violation of the inoperable vehicle provision was "serious" based on the circumstances surrounding the violation. Rather, the WHA appears to argue that the language of 24 C.F.R. § 966.4(*l*)(2)(i) mandates that any violation of the inoperable vehicle provision is a serious violation as a matter of law. The WHA argues as follows. Under 24 C.F.R. § 966.4(*l*)(2)(i), a public housing authority may terminate a tenancy for: "Serious or repeated violation of material terms of the lease, such as the following: (A) Failure to make payments due under the lease; (B) Failure to fulfill household obligations, as described in paragraph (f) of this section." The household obligations listed in paragraph (f) include the following: "To abide by necessary and reasonable regulations promulgated by the [public housing authority] for the benefit and well-being of the housing project and the tenants which shall be posted in the project office and incorporated by reference in the lease[.]" 24 C.F.R. § 966.4(f)(4). According to the WHA, because failure to abide by certain housing authority "regulations" is an example of a serious or repeated violation of a material term, violation of any of the WHA's regulations, presumably including the inoperable vehicle provision, is "by default, a serious violation."

¶23 The WHA's argument fails for multiple reasons. First, the WHA fails to develop any argument to the effect that the inoperable vehicle provision is a "regulation" within the meaning of 24 C.F.R. § 966.4(f)(4). *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992) (this court need not

address undeveloped arguments). For example, 24 C.F.R. § 966.4(f)(4) appears to apply only to regulations "posted in the project office." The WHA identifies no evidence showing that the inoperable vehicle provision was posted in any office.

¶24 More broadly, the WHA's argument fails because its proposed interpretation would lead to unreasonable results. *See Kalal*, 271 Wis. 2d 633, ¶46 ("[S]tatutory language is interpreted … to avoid absurd or unreasonable results[.]"). If any technical failure by a tenant to fulfill any "household obligation" set forth in 24 C.F.R. § 966.4(f) were, by default, a "serious" violation, this would permit eviction based on plainly minor infractions, contrary to the purposes of the Housing Act. For example, the household obligations listed in 24 C.F.R. § 966.4(f) include keeping the tenant's "dwelling unit and such other areas as may be assigned to the tenant for the tenant's exclusive use in a clean and safe condition." 24 C.F.R. § 966.4(f)(6).[7] A tenant's failure to keep his or her unit

---

[7] 24 C.F.R. § 966.4(f) lists a total of twelve household obligations, including the following:

(1) Not to assign the lease or to sublease the dwelling unit;

…

(8) To use only in a reasonable manner all electrical, plumbing, sanitary, heating, ventilating, air-conditioning and other facilities and appurtenances including elevators;

…

(11) To act, and cause household members or guests to act, in a manner which will not disturb other residents' peaceful enjoyment of their accommodations …;

…

(continued)

clean could technically violate this obligation, but uncleanliness is plainly not, in all cases, a "serious" lease violation warranting eviction of a tenant from subsidized housing. Moreover, as discussed above, other courts applying the "serious or repeated violation of material terms of the lease" standard set forth in 24 C.F.R. § 966.4(*l*)(2)(i) have considered the circumstances surrounding the violation in determining whether it warrants eviction, such as the limited financial resources of a tenant, which is the case here. The WHA's proposed interpretation of 24 C.F.R. § 966.4(f) would short-circuit this analysis by treating any violation of a "household" obligation as an automatic basis for an eviction.

¶25 Thus, although 24 C.F.R. § 966.4(*l*)(2)(i) lists "[f]ailure to fulfill household obligations" as an example of a serious or repeated violation of a material lease term, it is not a reasonable reading of regulatory language that every failure to fulfill a household obligation is serious as a matter of law. Rather, in context and in light of the purposes of the Housing Act, it is more reasonable to read the regulation as providing that failure to fulfill household obligations is an example of the types of lease violations that may warrant eviction, depending on the circumstances.

¶26 Based on the arguments of the parties, I conclude that Kester-Paletti's violation of the inoperable vehicle provision was not a serious violation of the lease.

---

(12)(i) To assure that no tenant, member of the tenant's household, or guest engages in:

(A) Criminal activity….

**2. The Tenant's Violation of the Inoperable Vehicle Provision Was Not Repeated**

¶27     Kester-Paletti's lease violation could also warrant eviction under 24 C.F.R. § 966.4(*l*)(2)(i) if it was "repeated."  According to one dictionary definition, repeated means "renewed or recurring again and again." *Repeated*, MERRIAM-WEBSTER DICTIONARY, https://www.merriamwebster.com/dictionary /repeated (last accessed August 13, 2024).

¶28     As noted above, the inoperable vehicle provision provides that "[t]enants are responsible for keeping their vehicles … operable" in the building parking lot.  Determining whether there was a "repeated" violation of this provision involves interpreting its language.  Interpretation of a contract presents a question of law that I review de novo. *Tufail v. Midwest Hosp., LLC*, 2013 WI 62, ¶22, 348 Wis. 2d 631, 833 N.W.2d 586.  "The primary goal in contract interpretation is to give effect to the parties' intentions," and contract interpretation begins with "the language of the contract itself." *Seitzinger v. Community Health Network*, 2004 WI 28, ¶22, 270 Wis. 2d 1, 676 N.W.2d 426. Contract language is analyzed "in context," as it is "reasonably understood." *Chapman v. B.C. Ziegler & Co.*, 2013 WI App 127, ¶2, 351 Wis. 2d 123, 839 N.W.2d 425.

¶29     Kester-Paletti argues that her violation of the inoperable vehicle provision was not "repeated" but instead was "a single continuing violation," presumably lasting from when she parked her vehicle in the parking lot on October 31, 2022, until she removed it on April 2, 2023.  I agree with Kester-Paletti that the language of the inoperable vehicle provision most reasonably leads to the conclusion that Kester-Paletti's violation was a single continuing violation. For a single continuous period, Kester-Paletti failed to keep her vehicle operable

while it was in the WHA parking lot. Although, as noted above, this period was prolonged, it does not follow that there were repeated violations. The WHA asserts that "[e]very day Kester-Paletti's vehicle sat inoperable was a violation," of the inoperable vehicle provision, but the WHA identifies no language in the inoperable vehicle provision or elsewhere in the lease that deems each such day to be a violation. Nor does the WHA explain why each day would constitute a violation, rather than any other arbitrary unit of time, such as an hour or a week.[8]

¶30 Even assuming that the lease is ambiguous as to whether failure to keep a vehicle operable for a particular length of time is a single or a repeated violation, Kester-Paletti nevertheless prevails. If contract language is ambiguous, the ambiguous language is "interpreted against the drafter." *Seitzinger*, 270 Wis. 2d 1, ¶22. The WHA could have drafted the provision to deem each day a vehicle sits inoperable in its parking lot to be a violation, or otherwise provide greater clarity, but did not do so. Any ambiguity therefore, must be resolved in Kester-Paletti's favor. *See id.*

¶31 Accordingly, I conclude that Kester-Paletti's violation of the inoperable vehicle provision was a single continuing violation, rather than a "repeated" violation. Even assuming that the lease is ambiguous as to whether

---

[8] In its argument that Kester-Paletti's violation of the inoperable vehicle provision was "repeated," the WHA also relies on provisions in the vehicle policy other than that provision. For example, the WHA contends that "[e]very month Kester-Paletti's vehicle did not move on a regular monthly basis was a violation of Section 5 of the Vehicle Policy" requiring tenants to drive their vehicles on a monthly basis. However, whether Kester-Paletti repeatedly violated any such provision is immaterial—the sole ground for eviction in this action is the violation of the inoperable vehicle provision. Moreover, the lease specifies that the WHA may "rely only upon those grounds cited in the termination notice" in an eviction action, and the additional vehicle policy provisions the WHA cites were not cited in that notice. I therefore do not consider other lease provisions and discuss the issue no further.

Kester-Paletti's violation was "repeated," this ambiguity must be interpreted against the WHA and in favor of Kester-Paletti's position.

¶32 In sum, considering the language and purposes of 24 C.F.R. § 966.4(*l*)(2)(i), and considering the circumstances surrounding Kester-Paletti's violation of the inoperable vehicle provision, I conclude that the violation was neither "serious" nor "repeated." Accordingly, the WHA has not shown that Kester-Paletti committed a "serious or repeated violation" of a "material" term of the lease, as required by 24 C.F.R. § 966.4(*l*)(2)(i).

## CONCLUSION

¶33 For all of these reasons, I reverse the circuit court's judgment of eviction.

*By the Court.*—Judgment reversed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.